(LOCAL LAW.)

</div>

<div align="center">

PRESTON v. BROWDER.

</div>

The Act of Assembly of North Carolina, of November, 1777, establishing offices for receiving entries of claims for lands in the several counties of the state, did not authorize entries for lands within the Indian boundary, as defined by the treaty of the *Long Island* of Holston, of the 20th of July, 1777. The Act of April, 1778, is a legislative declaration explaining and amending the former Act, and no title is acquired by an entry contrary to these laws.

ERROR to the circuit court for the district of East Tennessee. This was an action of ejectment commenced by the plaintiff in error in that court. On the trial of the cause. the plaintiff produced and read in evidence an entry made on the 25th of Feb-

ruary, 1778, in the name of Ephraim Dunlap, for 400 acres of land in the point between Tennessee and Holston rivers. Also, a grant to said Dunlap, issued in virtue of, and founded upon, said entry, under the great seal of the state of North Carolina, dated the 29th of July, 1793; which grant was duly registered. The plaintiff also produced, and read in evidence, a deed of conveyance, with the certificates of probate and registration endorsed, from Dunlap, the grantee, to John Rhea. Also, a deed of conveyance from said Rhea to the lessor of the plaintiff. It was also proved that the land lies within the boundaries of what was the state of North Carolina at the time of making said entry, and within the county of Washington; likewise, within the territory ceded by the state of North Carolina to the United States, in 1789, and within the now county of Blount, in the district of East Tennessee; that it lies on the south side of Holston river, and between Big Pigeon and Tennessee river, and west of a line described in the 5th section of the act of the general assembly of North Carolina, passed in April, 1778, chap. 3. Also, within the tract of country secured to the Indians in 1791, by the treaty of Holston, and that the Indian title thereto was relinquished in 1798 by the treaty of Tellico. The defendant produced and gave in evidence, a grant from the state of Tennessee to himself, made out and authenticated in the manner prescribed by the laws of Tennessee, and dated the 18th of May, 1810, which covers and includes the whole of the land in his possession, and for which this suit was brought. The

plaintiff, by his counsel, moved the court to charge and instruct the jury, " that an entry was actually made with the entry taker of Washington county, within which the land lay; that the entry was evidence that the consideration money was paid as required by law; that paying the consideration money, and making the entry, created a contract between the state of North Carolina and the said Dunlap, which vested a right in him to the land in dispute, and that it was not in the power of the legislature, at a subsequent period, to destroy the right thus vested, or rescind said contract, without the consent of the said Dunlap. That having the same land afterwards surveyed and granted, in the manner prescribed by the laws of North Carolina, vested in the said Dunlap and his heirs a complete title both at law and in equity; and, that the conveyance from Dunlap to Rhea, and from Rhea to the lessor of the plaintiff, vested a complete legal title in him, and, therefore, he was entitled to a verdict." Which charge and instruction the court refused to give to the jury; but, on the contrary, charged and instructed them, " that the said entry and grant were both null and void, and vested no title whatever in the said Dunlap, because, at the time of making said entry, and obtaining said grant, the land included therein lay in a part of the country where the laws of North Carolina had not authorized their officers to permit lands to be entered, or to issue grants therefor; and although the entry and grant might have been made in the form required

by law, yet no interest whatever passed from the state of North Carolina to Dunlap thereby; and, therefore, they ought to find a verdict for the defendant." A verdict was rendered accordingly, and a judgment pronounced thereon. To which charge and instruction the plaintiff's counsel excepted, and the cause was brought into this court by writ of error.

*Key,* for the plaintiff in error. The question in this cause turns upon the validity of an act of assembly of North Carolina, of April, 1778, repealing a former act of November, 1777, c. 1. s. 3., under which the plaintiff's entry was authorized. It is an *ex post facto* law, which the state is incompetent to pass; its own courts have decided, that a law, depriving a university of its lands, was unconstitutional and void.[a] This court has determined that a law in the nature of a convention or contract cannot be so repealed as to devest rights of property previously acquired under it.[b] As to the Indian title, the usufruct only, of this waste land, was reserved to them; and the legislature might grant lands subject to the extinguishment of their title to the domain of property. This was a mere temporary arrangement, and the title of the natives was extinguished by the treaty of Tellico. There was, therefore, nothing to prevent an entry of lands anywhere within the territorial limits of North Carolina.

a *Heywood.* Trustees of the University v. Foy.
b 6 *Cranch,* 87. Fletcher v. Peck.

*Pickens* and *Jones*, contra. 1. The correct mode of ascertaining the nature and effect of the *contract* (as it has been called) between the state and the plaintiff, is by a reference to the plain interpretation of the act of 1777, connected with the local history of that period, and the circumstances of the entry. The law provides, that entries may be made in the several counties of the state of all lands therein, not previously granted, and which shall *have accrued to the state by treaty or conquest;* most manifestly implying the necessity of a previous extinguishment of the Indian title. By the treaty of the Long Island of Hólston, of the 20th of July, 1777, art. 5th, a boundary between the Indians and the whites is defined; and, by art. 6th, the Indians are guarantied against all intrusion. The whole system of local laws establishes a police over the territory in question, with the express view of preventing the natives from being disturbed in the enjoyment of their rights. In 1778, finding that individuals, in the situation of the plaintiff, either wilfully or through mistake, had made entries within the Indian reservation, the legislature passed an act recognising the limits fixed by the treaty of the year preceding, prohibiting future entries, and avoiding those already made within those limits. 2. But supposing the *entry* to have been valid as a claim, or right of pre-emption, against other citizens, it was not *lawfully* consummated by a subsequent survey and patent. Is the entry of such stern, unbending authority, as, by relation back, to dispense with the necessity of subsequent steps? Certainly not. By the act of 1783, the Indian

1816.

*Preston*
*v.*
*Browder.*

boundary was changed, in conformity with the treaty of Hopewell, and the issuing of grants for lands within the reservation was prohibited. The land in question continued by that treaty, and by a subsequent treaty made in 1791, between the United States and the Cherokees, within the limits of the latter. The survey and grant were made in opposition to all these treaties and laws; and, in 1789, North Carolina ceded to the United States this territory, in which the state of Tennessee was erected. In 1791, the treaty of Holston once more guarantied the Indians against intrusion. So that the plaintiff's counsel has to bear up, not only against the municipal laws of the country, but against the most solemn pacts and conventions.

*Key,* in reply. The plaintiff's right, commenced by a valid entry, could never be impaired by subsequent laws and treaties. The primitive Indian title was merely subordinate, and subject to extinction. If, by the payment of the fees upon his entry, the plaintiff acquired an incipient right under the law then in force, it cannot be affected by any subsequent act. His grant is dated 1793, and a presumption thence arises, that he had complied with all preceding requisites. The cession of 1789 contains a reservation for perfecting titles where entries had been made. The act of 1778 shows, that the former law had allowed and countenanced entries in Washington county; it is not a declaratory, but a repeal-

c 6 *Cranch,* 87. Fletcher v. Peck.

ing statute, showing that the first law had not been mistaken nor misconstrued.

Todd, J., delivered the opinion of the court, and, after stating the facts, proceeded as follows:

The question now to be decided by the court is, whether the charge and instructions required by the plaintiff's counsel ought to have been given, and whether the one given was correct.

In the construction of the statutory or local laws of a state, it is frequently necessary to recur to the history and situation of the country, in order to ascertain the reason, as well as the meaning, of many of the provisions in them, to enable a court to apply, with propriety, the different rules for construing statutes. It will be found, by a recurrence to the history of North Carolina, at the time of passing this act, that she had, but a short time before, shaken off her colonial government, and assumed a sovereign independent one of her own choice; that, during the colonial system, by instructions and proclamations of the governor, the citizens were restrained and prohibited from extending their settlements to the westward, so as to encroach on lands set apart for the Indian tribes; that these encroachments had produced hostilities; and that, on the 20th of July, 1777, a treaty of peace had been concluded at fort Henry, on Holston river, near the Long Island, between commissioners from the state of North Carolina and the chiefs of that part of the Cherokee nation called the *Overhill* Indians; and that a boundary between the state and the said Indians was

established.  When the legislature of North Caro-
lina were passing the act of November, 1777,
establishing offices for receiving entries of claims for
lands in the several counties within the state, it is
improbable that the foregoing circumstances were
not contemplated by them; and hence must have
arisen the restriction in the act, as to lands "which
have accrued, or shall accrue, to this state, by treaty
or conquest." If this be not the ground or reason of
the provision, it will be difficult to find one on which
it can operate. It may be asked, where was the
land which was to accrue by *treaty or conquest*, if not
within the chartered limits of that state? If it was
in a foreign country, or from a sister state, the re-
striction was unnecessary, because, in either case, it
was not within the limits of *any* county within that
state, and, of course, not subject to be entered for.
The restriction must apply, then, to lands within the
chartered limits of the state, which it contemplated
would be acquired, by treaty or conquest, from the
Indian tribes, for none other can be imagined. It is
not to be presumed, that the legislature intended, so
shortly after making the treaty, to violate it, by per-
mitting entries to be made west of the line fixed by
the treaty. From the preamble of the act, as well
as other parts of it, it is clearly discernible that the
legislature intended " to parcel out their vacant
lands to industrous people, for the settlement there-
of, and increasing the strength and number of the
people of the country, and affording a comfortable
and easy subsistence for families." Would these
objects be attained by permitting settlements en-

croaching on the lands lately set apart, by treaty, for the use of the Indian tribes? by provoking hostilities with these tribes, and diminishing the strength of the country by a cruel, unnecessary, and unprofitable warfare with them? Surely not. However broad and extensive the words of the act may be, authorizing the entry takers of any county to receive claims for *any lands* lying in such county, under certain restrictions, yet, from the whole context of the act, the legislative intention, to prohibit and restrict entries from being made on lands reserved for Indian tribes, may be discerned. And this construction is fortified and supported by the act of April, 1778, passed to amend and explain the act of November, 1777 ; the 5th section of which expressly forbids the entering or surveying any lands within the Indian hunting grounds, recognises the western boundary, as fixed by the above-mentioned treaty, and declares void all entries and surveys which have been, or shall thereafter be made within the Indian boundary.

It is objected, that the act of April, 1778, so far as it relates to entries made before its passage, is unconstitutional and void.

If the reasoning in the previous part of this opinion be correct, that objection is not well founded. That reasoning is founded upon the act of 1777, and the history and situation of the country at that time. The act of 1778 is referred to, as a legislative declaration, explaining and amending the act of 1777. It is argued that there is no recital in the act of 1778, declaring, that the act of 1777 had been misconstrued

or mistaken by the citizens of the state; or, that entries had been made on lands, contrary to the meaning and intention of that act; and, that the 5th section is an exercise of legislative will, declaring null and void rights which had been acquired under a previous law. Although the legislature may not have made the recital and declaration in the precise terms mentioned, nor used the most appropriate expressions to communicate their meaning, yet it will be seen, by a careful perusal of the act, that they profess to *explain*, as well as to amend, the act of 1777. Upon a full review of all the acts of the legislature of North Carolina, respecting the manner of appropriating their vacant lands, and construing them *in pari materia*, there is a uniform intention manifested to prohibit and restrict entries from being made on lands included within the Indian boundaries. Therefore, this court unanimously affirms the decision of the circuit court with costs.

<div style="text-align:center">Judgment affirmed.</div>