Sutliff, J.
The object of this suit, as appears from the foregoing ■agreed statement of facts, is to recover back from the treasurer of Erie county, the amount of tax assesed against the plaintiff, under the “ act to tax banks,” etc., passed March 21, 1851, and collected on the 9th day of March, 1852.
The plaintiff insists that the act imposing the tax was in conflict with the provisions of the constitution of the. United States, and the constitution of this state, prohibiting the passage of any law impairing the validity of a contract, and therefore unconstitutional and void.
*If the statute was obligatory upon the plaintiff, it is admitted that the same constitutes a justification for the defendant, and judgment in that case should be rendered in his favor; but if otherwise, then judgment should be rendered in favor of the plaintiff for the amount of $1,377.91, so collected, with interest from the time of its collection.
The 1st section of the act of March 21, 1851, entitled “ an act to tax banks and bank and other stocks the same as other property is now taxable in this state,” provides as follows “ That it shall ibe the duty of the president and cashier of each and every banking institution incorporated by the laws of this sate, and having the right to issue bills or notes for circulation, at the time for listing personal property under the laws of this state, to list the capital stock of such banking institution under oath, at its true value in money, and return the same with the amount pf surplus and con *438 tingent fund belonging to such banking institution, to the assessor of the township or ward in which such banking institution is located ; and the amount so returned shall be placed on the grand duplicate of the proper county, and upon the city duplicate for city taxes, in cases where such city tax does not 'go upon the grand duplicate, but is collected by the city officers, and taxed for the same-purposes and to the same extent that personal property is or may be required to be taxed in the place where such bank is located; and such tax shall be collected and paid over in the same manner that taxes on other personal property are required by law tobe collected and paid over; provided, however, that the capital stock of any bank shall not be returned or taxed for a less amount than its. capital stock paid in.”
.Section 5 provides : “ That the taxes levied and collected in pursuance of the provisions of this act, shall be in lieu of any taxes which such bank or banking company would by existing laws be required to pay on its dividends or profit a ”
But the plaintiff insists that the sum of sixty-four dollars and thirteen cents, so set off in the bank for the state, under section 60 of said act of February 24, 1845, should have been accepted and received from the bank by the state ; and that the treasurer should ^thereafter have abstained from collecting any further tax from the bank.
We do not understand that the plaintiff objects to this law of March 21,1851, that it is not just and equal in its provisions toward banking companies; or that the rule of taxation is more onerous toward banks, than the rule under which personal property generally was at the time taxed in this state.
Indeed, it must be conceded, that if the legislature had the authority to impose any tax upon this bank at the time, the tax law of March 21, 1851, was a just and reasonable exercise of such authority. The banking institutions of the state have never, to our knowledge, charged that the law wp,s dictated by any sinister motive, or contained any provision that could be regarded as a masked assault, or covert attack upon their franchises. The law when passed, it is well known, had a support in the legislature from all political parties. Its sole object, as shown by its provisions, was to raise by an equal and uniform tax upon all private property within the state, sufficient revenue to meet the public exigencies of government. And upon the passage of the law, a *439 number of the best banks in the state, admitting its fairness, cheerfully acquiesced in its provisions, and thereafter continued to comply with its requisitions in the payment of their taxes imposed by the law.
But the plaintiff insists that by force of the 60th section of the act of February 24, 1845, under which it was organized, it was in law exempt from any future exercise of the right of taxation on the part of the state; and that the state became thereby bound to abstain, thereafter, from imposing any tax upon said bank.
If this objection to the passage of the tax law,' of March 21,1851, really exists, and the legislature had not, in fact, authority at the time to pass the law, it is obviously no answer to such objection, that the law so enacted is just and reasonable in its provisions.
A full investigation of the issue presented, requires a consideration-of two distinct and independent inquh’ies:
*1. Had any legislature of this state, under the constitution of 1802, power to gratuitously and arbitrarily inhibit a subsequent legislature from passing an equal and uniform tax law, reasonable and just in its provisions, imposing a tax upon all kinds of private property within the state, for the bona fide purpose of raising necessary revenue? and,
2. Was the legislature in fact prohibited from passing the tax law of March 21, 1851 ?
The right of taxation, like that of eminent domain, is one of the-highest prerogatives of government; and, as an incident of sovereignty, is derived by the legislature from the people. They both consist in the right of taking private property for public use. The right arises in each case from public necessities; and the exercise of these high prerogatives, is limited only by the exigencies of government. Neither taxation nor eminent domain ever was or can be the object of government. They are only its incidents. The exigency of the occasion is the sole basis on which these rights-rest; and the prerogatives themselves terminate with the exigencies which gave and sustained the right of their exercise. But. although the two prerogatives in their eminence and basis are similar, in other respects they are unlike. The. necessity for the-exercise of the right of eminent domain, is only occasional, and necessarily unequal, while that of taxation is constant and continuous, and may and ought to be equal and uniform. In the only particulars, material perhaps to the subject under consideration, *440 there is a strict analogy between the rights of eminent domain and taxation. They are alike mere incidents of sovereignty, alike limited strictly by the exigencies of the public, and alike indispensable to the existence of government; since, without the exercise of these rights, government must be devoid of position and revenue. Without the right of eminent domain, there could be found no place for the exercise of the legislative, judicial, or executive powers of government; nor could there be public ways for the exercise of social and commercial relations, nor even fortifications for the common defense. Without the right of taxation for revenue, there could be no legal means for the support or defense of government.
*It is therefore evident that the very existence of a free government is dependent upon the exercise of these high prerogatives according to the public exigencies. No reason or argument can be adduced in favor of or against the extinction or limitation of either of these prerogatives that will not apply with equal force to that of the other. If either right be exercised by government beyond the public exigency, such exercise is so far forth an usurpation of power. If the government be restricted in the perfect exercise of these prerogatives according to the public exigency, its functions for the beneficent and legitimate objects of government are so far forth impaired and rendered inoperative.
It follows, therefore, if the existence of a free government be a right and dependent upon the exercise of the rights of eminent domain and of taxation according to the public exigency, these rights are continuous and co-extensive with the existence of the government, as its necessary incidents, in all time future. And if this be so, the time-honored maxim under the English government, that “ Acts of parliament derogatory from the power of subsequent parliaments bind not,” would seem to apply with peculiar force under a free republican government, and to deny the power of a present legislature to extinguish^ impair, or limit the powers of subsequent legislatures. Indeed, the most extravagant exercise of those prerogatives, by a legislature acting under a constitution with or without enumerated powers, might be better maintained by reason and authority, than could any legislative attempt to prohibit a subsequent legislature in any respect from their exercise.
The government of this state, under the constitution of 1802, was not, it is true, one of enumerated powers ; yet the powers of gov- *441 .-eminent under that instrument were, in fact, although- not in degree, as absolutely limited as they are under our present constitu-r tion. The-constitution of 1802, vested the legislative authority of the state in a general assembly, subject only to certain limitations ■contained in other provisions of the instrument. Independent of the limitations expressed in the instrument, it is to be remarked that the constitution only assumed to ^confer upon the gen■eral assembly one of the three powers of government, to wit, the ■-legislative authority; and this being expressed, excludes the idea of either the judicial or executive powers being conferred upon that ■body. It was thus only the legislative authority of the state under the limitations of the constitution of the United States and the sub•sequent limitations contained in the instrument, which was thereby ■conferred upon the general' assembly by the people of the state.
The purposes and permanency of the exercise of the legislative ^powers conferred upon the general assembly, as expressed by the instrument, constituted further limitations upon the powers of that body.
As to the purpose of the grant, it is clearly expressed by the term. “ legislative authority.” It was only adequate authority for the purpose of enacting the necessary and proper laws for the government of the people of the state, which was so vested in the general .assembly. It was only for the purpose of legislation, not for the purpose of negotiation, nor of adjudication, nor for any executive administration.
The permanency of the existence and exercise of the legislative authority so conferred, as clearly indicated by the instrument, constituted a further limitation upon the powers of the legislature under the constitution of 1802. The following is the language of the grant: “ The legislative authority of this state shall be vested in a general assembly which shall consist of a senate and house of representatives, both to be elected by the people.” The instrument also provided that the representatives should be chosen annually, and the senators biennially thereafter, making continuous and permanent the grantee or repository of the legislative authority so granted. It can not, therefore, be said that the constitution of 1802, by its language did not in fact grant as full and absolute legislative authority to the general assembly last elected, as to the one first elected under that instrument. Each successive general assembly,- from the time of the first organization of that body, derived its legislative *442 authority under that constitution immediately from the same source of sovereignty, the people; and not mediately through any '^preceding legislature. Each succeeding general assembly in session, like the first, had only to look to the language of the constitution as the chart and limit of its powers, and not to the acts of preceding legislatures, to ascertain to what extent their legislative authority had become extinguished.
Upon this point, it might indeed seem sufficient to say that while authority to legislate is by the constitution expressly given to a general assembly to be elected from time to time continuously, to be -,used, no authority is given to any session of that body to extinguish or inhibit that legislative power as to any subsequent legislature. That no such power has in fact been given, should be conclusive against its attempted exercise. But the constitution of 1802 expressly declares, that to guard against the transgression of the high powers thereby delegated, all powers not therebg delegated remain-with the people.
It would seem, therefore, to follow, incontrovertibly, that no legislature under the constitution of 1802, had the power to inhibit any subsequent legislature from the exercise of the right of eminent domain, or taxation for revenue purposes, upon any kind of private-property within the state, belonging to its citizens.
If this proposition be incorrect, its converse must necessarily be true; and it would then follow that one legislature had the right to-exempt certain kinds of private property within the state from taxation. But who shall determine what kind of property and what amount shall be so exempt ? Obviously the legislature itself must, decide. If then it chance that an existing legislature deem it expedient to exempt all property vested in, and produced by the manufactories of the state for the next twenty years from taxation, the-exemption would be binding on the subsequent legislatures. And if the next legislature, in its like discretion, should deem it expedient, and proceed to pass a law exempting the capital and products-of agricultural pursuits from taxation for a like term, that exemption too would be obligatory upon subsequent legislatures. In like manner succeeding legislatures, in the exercise of the same power, if in fact possessed by that body, might in their discretion exempt from ^taxation all property invested in mercantile, banking, and brokers’ business — and in short every species of private property might thus, under the exercise of such power, become legally *443 exempt from taxation. All the means of revenue would be thus1 utterly cut off, the operations of government paralyzed, and its existence extinguished.
The same reasoning applies with equal force against any attempted limitation or restriction upon the powers of subsequent-legislatures to exercise the right of taxation and of eminent domain, as necessary incidents of sovereignty, according to the public exigencies. Any limitation, or impairing of the powers of subsequent legislatures is so far forth destructive of the governmental powers;- and such example might, if the power were conceded, be follqwed by succeeding legislatures, and the operations of government thereby would, though less suddenly, none the less certainly, become terminated. .
A concession to any legislature of power to limit or inhibit the-exercise by any subsequent legislature of the legislative authority to any extent, is in effect acknowledging the absolute sovereignty of the legislature to which such concession is made, and is a virtual surrender of the right of self-government. It is conceding to the legislature constituted to exercise and perpetuate legislative authority for the preservation and prosperity of government, the right to-terminate and destroy both.
Independent of any constitutional limitations, there could be no-implied grant to governmental agencies, of any but necessary powers for governmental purposes. Such limitation would justify the needful use of the right of eminent domain and the right1 of taxation ; but it would forbid any attempted enlargement or restriction of either of those prerogatives. Their use or exercise would be justified because necessary for the perpetuity and prosperity of government, and their enlargement or restriction forbidden because unnecessaryr without even implied authority,' and tending to the destruction of government.
All experience has shown that authority is ever liable to abuse and this is even true of delegated, as well as of- usurped authority. *Hence the necessity of a constitutional division and limitation of governmental powers to the different departments, in order to constitute and preserve a free government. The constitution of 1802, clearly asserted the doctrine, that the sovereignty of the state was in the people, and only derived from them as its source by the-different departments of government, through that instrument, for the purposes and under the limitations therein expressed. The ob *444 jects and purposes of that constitution, as well as its. provisions, show that the division, grant, and limitation of powers to each of the departments were made by the instrument, and to be continuous as made, and co-extensive with the constitution in duration. The general assembly, therefore, in my opinion, neither by the letter nor spirit of the constitution of 1802, derived any authority to enlarge or in any respect extinguish or limit the right of taxation, or any other power delegated by the instrument of the legislature, or either of the other departments of government.
Entertaining these views, I am clearly of the opinion that no legislature, under the constitution of 1802, had power to inhibit or restrict any subsequent legislature in the exercise of the right of taxation to the full extent given by that instrument. And if section 60 of the act of February 24,1845, were intended as such restriction, the same would, in my opinion, for want of power in the legislature for such purpose, necessarily be utterly nugatory and inoperative as a restriction upon the exercise of the right of taxation by subsequent legislatures.
But independent of the considerations submitted, and without resting our conclusions in this case upon the want of power in preceding legislatures to make the prohibition, let us proceed to the second inquiry:
Was the legislature in fact, at the time of passing the tax law of March 21,1851, inhibited from passing the same?
The power to pass such a law, as we have seen, was given by the constitution to each successive legislature, to be used respectively in' their discretion to meet the exigencies of government. If in 1851 that power had been taken away from that body, inasmuch as *the power had not been revoked in the usual manner, by an amendment of the constitution, it must have been taken in an unusual manner. And such is the claim. It is said that the power to enact the tax law of March 21, 1851, was taken away from succeeding legislatures by section 60 of the act of February 24, 1845. It must, however, in candor'be conceded, from the fact and purposes of this power having been by the constitution vested in the general assembly, that the legal and rational presumption is that the power still remained as delegated, in that department of government. And every presumption in law and reason is against the idea of the power so vested having been extinguished or restricted by statute. These presumptions then, let it be remembered, apply at every *445 stage of the argument against the proposition that section 60 was designed to be, or in fact was, a restriction of the right of taxation, and imperatively demand a construction of that section, if. susceptible of such an one, utterly irrestfictive of the right of taxation by subsequent legislatures.
It is not pretended that the language of section 60 is a mandatory restriction of the right of taxation in subsequent legislatures; but it is insisted that the section is to be regarded as a contract, and in its effect and operation necessarily restrictive so far forth of the power of the general assembly to exercise the right of taxation.
Is this the true and only reasonable construction of that section? If so, and not otherwise, such a construction must be adopted.
It is, then, incumbent on the plaintiff claiming the benefit of an exemption from the common duty of taxation, to which all are by the general rule subject, to show the validity of such claim beyond any reasonable doubt; and this would be so even if the claim of exemption depended upon the language of section 60, and the intention, independent of the power of the legislature. If it still remained doubtful whether that section of the act should be regarded as a surrender by the legislature of the right to amend the rule of taxation thereby expressed, for a two-fold reason the state has the right to have that doubt resolved in her favor. In *the first place, it is a rule of common law “ that when a charter may be taken to two intents, each of which are good and effectual, it should be taken to such intent as most beneficial to the king ” — to the state. Vinton’s Abridgment, Prerogative. See also Stourbridge Canal v. Wheeley, 2 Barn. & Adol. 792. So in this case, if by a particular construction section 60 may be regarded as amounting to a contract, and by another construction as only an enunciation of a present mode and measure of taxing the banks, the rule of common law would require the latter construction. But a surrender of the right of amendment of section 60, as claimed by plaintiff, is not only, as we have seen, the surrender of a necessary prerogative of government by the legislature without constitutional authority given that body to make it, but without any consideration or equivalent for such surrender. Every presumption -and doubt is therefore for these reasons also to be held against such intention and action on the part of the legislature.
Let us then proceed to inquire whether section 60 of the act of February 24,1845, is a compact between the plaintiff and the state.
*446 A contract is, as defined by Sir William Blackstone, and as usually understood, “ an agreement,.upon sufficient consideration, to do ■or not to do a particular thing.”
The following are the provisions of that, section; “Each banking company organized under this act, or accepting thereof, and complying with its provisions, shall semi-annually, on the days designated in the 59th section for declaring dividends, set off to the state ■six per centum of the profits, deducting therefrom the expenses .and ascertained losses of the company, for the six months next preceding ; which sum or amount so set off shall be in lieu of all taxes to which such company, or the stockholders thereof, on account of ■stock owned therein, would otherwise be subject; and the cashier ■shall, within ten days thereafter, inform the auditor of state of the .amount so set off, and shall pay the same to the treasurer of state ■on the order of said auditor; but in computing the profits of the ■company for the purposes aforesaid, the interest received on the certificates of the funded debt of this state held *by the company, or deposited with, and transferred to the treasurer of state, •or to the board of control by such company, shall not be taken into .account.”
Is the foregoing section a contract within the meaning of the constitution of the United States and the constitution of this state?
The 10th section of the 1st article of the constitution of the United ¡States provides that “ no state shall pass any law impairing the obligation of contracts; ” and the 16th section of article 8 of the con■stitution of Ohio (1802), provides that “no ex post facto law, or law impairing the validity of contracts, shall ever be made.”
If, therefore, section 60 be a contract binding the state to impose no other tax than the one therein expressed upon the bank, the tax law of March 21, 1851, would be obviously in conflict with the provisions of the constitution referred to.
In the case of Fletcher v. Peck, 6 Cranch, 135, Chief Justice Marshall defines the term contract, as used in the constitution of the United States, in the following language:
“A contract is a compact between two or more persons, and is ■cither- executory or executed. An executory contract is one in which a party binds himself to do or not to do a particular thing. A contract executed is one in which the object of the contract is performed; ‘ and this,’ says Blackstone, ‘ differs in nothing from a grant.’ ”
*447 If, then, section 60 be a contract, it is an executory contract, a compact or mutual agreement between these two artificial persons, the state and the bank. And this contract, if it be one, must possess the requisites of all contracts to render it obligatory. There must be: 1. Parties capable to contract; 2. A legal subject-matter of contract; 3. A sufficient consideration; and, 4. Sufficient and apt words to express the terms of the contract, and to render the same obligatory upon both parties.
Does section 60 possess these several requisites, indispensable to constitute a valid contract? There are, it is true, the neeessary parties; and perhaps capable to contract; but, to say nothing of the legality of the subject-matter — exemption from taxation *to be contracted for, there seems utterly wanting every other requisite of a valid contract.
1. As to the consideration. It is not pretended that the company paid the state any bonus for its franchise; nor that exemption from taxation constitutes any necessary part or incident of the franchise of an incorporated banking company. Nor is the company bound to exercise its franchise or to declare any dividend of profits. It may, from time to time, invest the entire proceeds of the business in state stocks, “ certificates of the funded debt of this state,” dividing only the interest thereof during the continuance of their business; and which, by the terms of the law, is excluded from the estimate of profits.
Thus the bank, with a large capital and doing a lucrative business, might not pay, nor the state receive, any tax whatsoever. And if such a right of exemption should be denied, the only redress for the state, or penalty to the bank, would be, that after a tedious litigation the franchise of the bank might possibly be adjudged forfeited. There is then no consideration, not even that of mutual promises or mutual obligation between the parties.
2. There are no apt and sufficient words used making definite the terms of any contract, and imposing obligations upon both parties respectively to each other. No obligation is thereby imposed upon the banking company to either commence or continue business at or for any definite time.
Again, it may be remarked that neither the legislature nor the banking companies, after the passage of the act of February 24, 1845, seemed to regard or construe the act to be a contract.
The next legislature that convened passed the act of January 6, *448 '1846, amending the 5th section of the law, and to take effect upon, a majority of the board of control filing their assent to the amendment. And yet the amendment only affected the banking compianies respectively, and in no manner the board of control. If section five was then to be regarded as a contract, the board of' control was in fact no more a party to that contract than was the-board of county commissioners. Other amendments of the law of' 1845 have also, since its enactment, been, made by the legislature ^inconsistent with the idea of the law being regarded as a contract. See the amendments of March 12, 1845; January 22,. 1846 ; March 8, 1850, and March 19, 1850.
It appears, therefore', from, the long received general understanding and acceptation of the term contract, and the construction given by successive legislatures to the act, and accepted by the banks orr ganized under it, that section sixty of the act to incorporate the-State Bank of Ohio, etc., passed February 24, 1845, is not a contract. It does not possess the indispensable requisites to constitute a contract.
It is, however, suggested that, even if it be conceded that this* act of the legislature is not a contract in the common acceptation of the term, section sixty of the act may be regarded as a law in the nature of a contract — a law so like a contract as to be protected against repeal or amendment by the constitutional provision inhibiting the legislature from passing any law impairing the obligation of a contract. To this it might be sufficient to reply, that if the law be only in the nature of a contract, like a contract, the-maxim “ nullum simile est idem ” would aj3ply. If only like,'it is not the same; and so not included within the constitutional prohibition.
But it may certainly be doubted whether either the constitution of this state, or that of the United States, ever contemplated any statutory enactment being included by the term contract, jn the prohibition contained in those instruments against passing any law invalidating a contract. In my judgment, however, it is not doubtful, but certain that those prohibitions were neither of them ever designed, nor should they be understood, to include in the term contract a statute passed by the state for revenue purposes, so as to preclude the legislature from revising, repealing, or amending the same to meet the exigencies of the state government. And this too, whether such revenue statute consists of an entire act de *449 voted to the subject of revenue, or of a single section, like that of' section sixty under consideration.
Nor do the foregoing views at all conflict with the idea of' vested rights under statutory provisions. Eights becoming vested, under a statute while in force, are not impaired by its appeal.. *When vested and fully acquired, such rights are to be regarded as executed contracts, differing in no material respect from grants. As in the present case, so long as section 60 remained in force, and the banks paid their tax under that section, they thereby acquired the benefit of its provisions, and could not be subjected to any further liability to a tax for the time past, if the section had been, immediately after such payment, rejoealed. Yet such right of exemption under the law for time future, depending upon the law and the payment according to its provisions, not yet having become vested, would necessarily terminate with the repeal of the section or its amendment, as by the law of March 21, 1851. So of all rights vested under a statute, it is a general rule, that the statute-may be repealed or amended; and by a like general rule, all rights vested or acquired under the statute while in force, remain unimpaired by such repeal. Thus, in the case of Fletcher v. Peck, 6 Cranch, 135, C. J. Marshall remarks: “ The,, principle asserted, is,, that one legislature is competent to repeal any act which a former legislature was competent to pass; and that one legislature can not. abridge the power of a succeeding legislature.” The correctness of this principle, so far as respects general legislation, can never be-controverted. “ But if an act be done under a law, a succeeding legislature can not undo it. . . Where, then, a law is in the natirre of a contract, where absolute rights have vested under that contract, a repeal of that law can not divest those rights.”
It has also been suggested that the act of February 24,1845, may at least be regarded as a proposition, on the part of the state, inviting organization under the law ; and'-being followed by the provision, that “ such sum or amount to set-off shall be in lieu of all taxes to which such company, or the stockholders thereof, on account of stock owned therein, would otherwise be subject,” it is insisted that upon the organization of the company the provision ought to become obligatory upon the state.
To this view of the case there are two answers. In-the first, place, the language of the act does not admit of its being regarded as a proposition inviting organization. Arid secondly, if otherwise, *450 *the company has never so accepted the proposition as to be bound to the performance for any definite time in future.
If the act be regarded as a proposition for an exemption from taxation, the important inquiry at once arises — for what length of time is the exemption to continue? and by the supply of what words is the answer to be expressed? Shall it be the words, “ during the continuance of the organization of the company,” or, by the words, “ so long as said company shall continue to set off and pay to the state said six per centum on her profitsor, shall the uniform understanding under all other tax laws obtain under this; and the answer be supplied by these words, “ until otherwise provided hy law ?”
Even conceding the unreasonable proposition, that the entire act of February 24, 1845, should be regarded as a charter, it would not follow that the mode and measure of taxation expressed by section 60, could not be changed. “ Charters are to be expounded as the law was understood when the charter was granted.” 2 Inst. 282. And the history, situation, and past legislation of a state may be resorted to, in order to expound its legislative intention. Preston v. Boude, 1 Wheat. 115; Charles River Bridge v. Warren Bridge, 11 Pet. 420. The effect of the act of March 7,1842, providing expressly for the future amendment or repeal, therefore, necessarily had the same effect as if its provisions constituted one section, of the charter.
And if it could be shown (as we think it can not) that the tax ■law of March 21, 1851, divested a vested right of the bank to taxation only under the provisions of section 60, during its continued ■organization and future operations, unless the right so claimed rested in contract, the act of March 21,1851, would still be obligatory upon the bank. In pronouncing the opinion of the court in the case of Charles River Bridge v. Warren Bridge, 11 Pet. 539, C. ,J. Taney says: “ It is well settled by the decisions of this court that a state law may be retrospective in its character, and may divest vested rights, and yet not violate the constitution of the United States, unless it also impairs the validity of a contract.”
To the same effect are opinions expressed *in the case of Satterlee v. Matthewson, 3 Pet. 413, and in the case of Watson and others v. Mercer, 8 Pet. 110. Nor can the contract so alleged to be impaired by a statute, ever be sustained by implication. See United States v. Arredondo, 6 Pet. 738, and the cases there fully collected.
*451 The plaintiff can not, therefore, rest a claim of exemption from taxation under the law of March 21,1851, upon a mere vested right-derived by the bank under section 60 of the act of 1845. The -claim of the bank to a continuance in future of the privileges conferred by section 60, after the passage of the tax law of March 21, 1851, if valid, must rest solely in contract. It must be maintained 'by the plaintiff, over the act of March 7, 1842, and all the other objections suggested to such a construction, that section 60 was and is a valid contract, obligatory upon the state, restraining the legislature from imposing any other tax upon the bank. And this character for the law of 1845, can only be made out, as it seems to me, from ingenious and illogical reasoning, instead of a plain reading of the several acts of the legislature under consideration.
There remains a still further objection to the construction insisted upon, on the part of the plaintiff. If by any reasoning section 60 of the general banking law of 1845, can be considered a contract, precluding the state from varying the mode and measure of taxing the banks thereby expressed, by analogy of reasoning it would seem inevitably to follow that there must be other exemptions. This rule of construction, once established, would be insisted upon, and seems equally applicable under other statutes. Taxes assessed upon lands within the state at the time of their purchase, especially upon the lands sold by the state, could not, for the same reason, be varied or increased by the legislature.
Let us illustrate the correctness of this proposition by its application to preceding acts of legislation in this state.
On the 27th of January, 1806, the legislature passed a law providing that all lands of individuals should be subject to tax as follows : That the lands should be rated according to their value *in a state of nature, into three classes; that lands of the first class should be taxed at the rate of ninety cents, the second class at sixty-five cents, and the third rate at forty cents per hundred acres. After enacting this law, and while it was in full force, the legislature passed another law authorizing certain lands belonging to the state to be sold at public auction to the highest bidder, at not less than two dollars per acre. Notice of the sale of these lands was required by the law to be given as well in certain newspapers of adjoining states as in this state, in order to invite competition. Now upon the day of sale was it not as reasonable to suppose that the farmer who had come from another state to invest. his capital *452 in the purchase of unimproved lands, to be cultivated and rendered valuable, and thereby to increase as well that of the state, as his own wealth, would not look to the probable amount of tax to be paid to the state on the land, as well as the purchase money to be paid to the state for the land ?
The only difference observable between these laws relating to the farming interests, and those under consideration relating to the banking interests, is certainly in favor of the former, if natural persons are entitled to the same respect as artificial persons under our government. The reasons to be rendered are in favor of the farmers’ tax law, in the case proposed, not being increased, when compared with those urged against an increase of the tax upon the banking interests. The state received a stipulated consideration, not less than two dollars per acre for the land, from the purchaser, and a tax of perhaps ninety cents per hundred acres to bo certainly paid, under such purchase, in all time future, and also the consequent necessary increase of the strength and wealth of the state* by the settlement, cultivation, and improvement of the lands so-purchased.
The banking companies paid no consideration, and in their contemplated operations promised no such prospective advantages to the state as did the farmers. Why, then, might not the farmer, who, accepting the published invitation of the state, had complied with the proposition so advertised, and purchased and paid for his farm — why might he not object to an increase of the tax *after improving his lands, beyond that imposed by the existing law under which he had so purchased.
But it has never been pretended or claimed by the purchasers of lands under such circumstances, that the mode and measure of taxing the lands so purchased could not be varied and increased by future legislation. The legislature has exercised this right, repealed the tax law imposing only from forty to ninety cents per hundred acres, and in some cases has increased the tax upon the lands a hundred fold. And this action of the legislature has boon cheerfully and unanimously acquiesced in by those affected thereby.
Neither the language of section 60 of the general banking law, nor of any other section in that act, expresses any intention of the legislature to prohibit future legislatures from amending or *453 varying the mode and measure of taxing the banks. And such intention can never be presumed.
But if there could otherwise be infex*red any doubt as to the understanding and intention of the legislature that section 60 was in fact subject to future amendment like other tax laws, that doxxbt would seem to be dissipated by another statute already referred to. At the time of the passage of the genox’al bapking law of February 24, 1845, the statute of March 7, 1842, was in full force, providing that all subsequent corporations, whether possessing banking powers or not, were to hold their charters subject to alteration, suspension, and repeal, in the discretion of the legislature. See 40 Ohio L. 70.
It appears, therefore, that when the legislature enacted section 60, instead of thereby intending an unalterable contract, they enacted that section under an existing statute law authorizing any subsequent legislature to correct the rule of taxation thereby established ; to modify and reduce the tax thereby imposed, if found too high, or to increase the tax if too low.
Unless, therefore, legislators are exceptions to the general maxim, that “ all men ax’e presumed to know the law,” it follows that the legislature, at the time of enacting section 60, had certain knowledge that the same was, like other laws, sxxbject to revision and ^amendment by futxxre legislatures. It is evident, thexx, that when the act of February 24, 1845, called the general banking law, was enacted, section 60, prescribing the mode and measure of taxing banks organized under that law, was not a contract, but a simple legislative enactment, susceptible of amendment or repeal,’ like all other tax laws.
It is therefore certain, if section 60,'at the time of the enactment of the tax law of March 21,1851, was a contract on the part of the state, so as to preclude further legislation upon the same subject, invalidating section 60, it must have changed from an amendable and repealable statute into a contract, at some time subsequexxt to its enactment, and previous to the passage of the law of March 21, 1851.
At what time, and by what agency, then, was section 60 of the general banking law of 1845 changed from its admitted character of an amendable and repealable law when enacted, into a contract obligatory upon the state, in March, 1851, so as to then be, like the .laws of the Medes and Persians, unchangeable ? It appeax’s, there *454 fore, evident, both from the language used, and the provisions contained in the act of February 24,1845, and also from the fact of the-statute of March 7, 1842, authorizing its future amendment or repeal, .that the legislature, at the time of enacting the banking law of 1845, did not regard section 60 of the act as a contract; but supposed the same amendable by subsequent legislatures, like other tax laws.
It is not, perhaps, material whether the banking companies, organizing under that act, did or did not regard any of the sections of the act as amendable. But if the companies organizing and commencing operations under the act, gave the matter any attention, it would seem that they must necessarily have regarded section 60 of the- act as amendable, for the following reasons, among others:
1. Independent of the consideration of want of power in the legislature to inhibit a future amendment of a revenue law, there had been upon the statute book, ever since the session of 1841-1842 of the legislature, a statute providing “ that the charter of every corporation, of every description, whether possessing ^banking powers or not, that [should thereafter] be granted by the legislature-should], be subject to alteration, suspension, or repeal.” And this act was not repealed until March 12, 1845.
2. The provisions of the act itself indicated no more intention of perpetuity of the particular mode and measure of taxation, expressed by section 60, than previous laws imposing taxes upon different classes of persons and property, and which had all been ’subject to repeal or amendment, in the discretion of future legislatures.
3. Those organizing under the provisions of the act of February 24, 1845, knew that they had paid the state no bonus, no consideration, for the mode and measure of taxation imposed by section 60, and therefore must have supposed it expressive of a rule which was intended to impose a just and equal tax upon the property to be invested in banking; and subject to any proper correction by future legislatures.
But the act of February 24, 1845, now under consideration, has already received the construction of this court. That act, for the first time, came before this court, for a judicial construction, at the January term, 1853. By the unanimous opinion of all the members of the court, section 60 of the act was then held to be no contract, *455 but a statutory law, subject to amendment or repeal, like other statutory tax laws, which have been from time to time enacted and. amended, or repealed, in the discretion of successive legislatures.
This court has, subsequently, had occasion, in quite a number of cases, to give a construction to that act; and the construction given, by the court has uniformly been the same.
It is true, some of these cases have been taken before the Supreme Court of the United States for revision; and a bare majority of the members of that court gave a different construction to the statutes of this state from that given by the undivided opinion of this court.
In pronouncing the opinion upon the construction of the statute, in one of those cases, C. J. Taney says: “ It is true that this court always follows the decisions of the state courts in the construction of their own constitution and laws. Butwhere those ^decisions are in conflict, this court must determine between them.”
Mr. Justice Catron states the rule in even stronger language. Speaking of the construction given by this court to our statutes and the constitution of this state, he says: “ It must be conceded, as I think, that the Supreme Court of Ohio has the uncontrollable right to declare what that meaning is; and that this court has just, as little right to question that construction, as the Supreme Court of Ohio has to question our construction of the constitution of the United States.”
But even if we concede all that is claimed by the distinguished Chief Justice, that where the decisions of the state court upon the construction of the laws of the state, relating to its own domestic police, ate in conflict, that court should dictate a construction; we, do not recognize this as such a case. ¥e are not aware that the statutes under consideration ever came before the Supreme Court of this state for a judicial construction previous to 1853. And all the members of the court were then unanimous in the construction given to these statutes; and from that construction this court has never departed. We do not, therefore, in view of the rules held by that eminent court in such cases, with all the respect and deference entertained toward the opinion of the majority of that court, feel at liberty to depart from our own settled convictions of the correctness of the construction heretofore uniformly given to the statutes under consideration by this court.
Judgment must therefore be entered for the defendant.