## DR. J. L. STEPHENS CO. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit.   March 13, 1913.)

No 2,283.

1. DRUGGISTS (§ 12*)—DRUGS—MISBRANDING—"PACKAGE"—"ORIGINAL UN-BROKEN PACKAGE."

Where defendant was accused of shipping misbranded medicines in interstate commerce, in violation of the Pure Food and Drugs Act (Act June 30, 1906, c. 3915, 34 Stat. 768 [U. S. Comp. St. Supp. 1911, p. 1354]), it was not necessary that the information allege that the boxes of packages containing the bottles of medicine were misbranded, it being sufficient that it charge that each of the bottles contained in the packages was misbranded; the word "package" as used in the act, having reference to the package which passes into the possession of the public, or the real consumer, and the words "original unbroken package" to the package in the form in which it is received by the vendee or consignee.

[Ed. Note.—for other cases, see Druggists, Cent. Dig. § 11; Dec. Dig. § 12.*

For other definitions, see Words and Phrases, vol. 6, pp. 5059–5063, 5154.]

2. DRUGGISTS (§ 12*)—DRUGS—MISBRANDING—PRESCRIPTION.

Where defendant company operating a sanatorium where persons addicted to the drug and liquor habits were treated shipped boxes of misbranded medicines in interstate commerce to a patient, it was no defense to a prosecution for violating the Pure Food and Drugs Act (Act June 30, 1906, c. 3915, 34 Stat. 768 [U. S. Comp. St. Supp. 1911, p. 1354]) that the sending of the medicine was a mere incident of defendant's employment, the primary object of which was the diagnosis of the patient's ailment and the preparation of a prescription for the needs of his particular case.

[Ed. Note.—for other cases, see Druggists, Cent. Dig. § 11; Dec. Dig. § 12.*

What constitutes a violation of pure food regulations, see note to Brina v. United States, 105 C. C. A. 559.]

In Error to the District Court of the United States for the Western Division of the Southern District of Ohio; J. E. Sater, Judge.

The Dr. J. L. Stephens Company was convicted of violating the Pure Food and Drugs Act, and it brings error. Affirmed.

Bruce & Bruce, of Cincinnati, Ohio, and Eltzroth & Maple, of Lebanon, Ohio, for plaintiff in error.

Sherman T. McPherson and Wm. M. Coffin, both of Cincinnati, Ohio, for the United States.

Before WARRINGTON and DENISON, Circuit Judges, and COCHRAN, District Judge.

PER CURIAM.   This is a proceeding on writ of error to set aside a judgment rendered and sentence pronounced upon an information. The information contained two counts, and was based on the Pure Food and Drugs Act of June 30, 1906 (Act June 30, 1906, c. 3915, 34 Stat. 768 [U. S. Comp. St. Supp. 1911, p. 1354]).   The plaintiff in error, hereafter called defendant, is an Ohio corporation doing busi-

ness and having its principal office at Lebanon, Ohio. It there maintains a sanatorium, where persons addicted to the drug and liquor habits are treated; and patients are also treated away from the institution through correspondence. According to an agreed statement of facts, the defendant shipped two boxes of medicine by railway from Lebanon, Ohio, to Washington, D. C.; one shipment was made December 19, 1908, and the other, October 22, 1909; each box contained 18 bottles of the medicine, and all the bottles contained alcohol as one of the ingredients, and some contained as another ingredient morphine in varying and diminishing quantities. The bottles were labeled,

"Maplewood Sanatorium. Ledger M. 45. 3,609. Directions: Take half a tablespoon four times a day and as directed."

The president of defendant, who was also its medical director, has charge of the patients at the sanatorium, and also of those who are treated at a distance through correspondence. He is a graduate of Columbia University, and has had a long and varied professional experience He is a specialist in the treatment of patients addicted to drug and liquor habits. In the agreed statement of facts this appears:

"It is a recognized fact by the medical profession generally that in the treatment of diseases, especially the drug habit, it is an important, and in most cases a vital factor, that the patient should not know the composition of the medicines given in such treatment."

This agreed fact is offered as a defense to the charge that the medicine in question was mislabeled and misbranded, because correct labeling and branding would defeat the object of the treatment. The defendant has no proprietary medicines, and does not offer or sell any medicines to the general public. In every case where a patient applies for treatment, either at the sanatorium or at the patient's home, a history of the case is obtained from the patient, a diagnosis in each instance is made, and a prescription prepared by the medical director to meet the needs of the particular case.

· The cause was submitted upon the agreed statement of facts alluded to, and each party asked for a directed verdict. The case was fully considered by the trial judge, who directed a verdict in favor of the government and sentenced the defendant to a fine of $50 and costs of prosecution.

[1] Among the questions determined was whether it was necessary to allege that the two boxes or packages containing the bottles of medicine were misbranded, the information having simply charged that each of the bottles contained in such packages was misbranded. The court held that the word "package," as used in the act, "means the package which passes into the possession of the public, of the real consumer; and that the words, 'original unbroken package,' relate * * * to the package in the form in which it is received by the vendee or consignee."

[2] Another question determined was:

" * * * Whether the Pure Food and Drugs Act deals with articles other than those which are the subject of bargain and sale. It is urged that the

medicine or prescription is a mere incident of the services rendered, and that it is not therefore to be treated as an article of commerce."

Upon this question the court held:

"As was said in the Hipolite Egg Co. Case, 220 U. S. 45 [31 Sup. Ct. 364, 55 L. Ed. 364], the object of the law is to keep adulterated and misbranded articles out of the channels of interstate commerce, and it is immaterial whether the medicine or prescription which was furnished by the defendant company was the mere incident of the employment, or its primary object. It is enough to know that the medicine or prescription was sent through the channels of interstate commerce, and misbranded, within the terms of the act."

Still another question was determined:

"Is a reputable, regularly licensed, practicing physician, residing in Ohio, who prescribes for a person beyond the limits of the state and transmits to such person through the channels of interstate commerce the medicine prescribed, subject to the penalties of the law, if the medicine so prescribed and so passing through the channels of interstate commerce, contains morphine —the bottle, box, container, or package inclosing the medicine· so prescribed and to be taken by the patient not being so labeled as to show the presence of the drug?"

We do not find it necessary to pass upon the last question stated. The medical director did not in his individual capacity prescribe or furnish the medicine for the persons served in this case. His acts were performed for the corporation, and in legal contemplation by it. State v. Laylin, 73 Ohio St. 90, 100, 76 N. E. 567. We agree with Judge Sater in his conclusions upon the other two questions, and so must affirm the judgment.

NOTE.—The charge of Sater, District Judge, in the District Court, referred to above, is as follows:

This case is submitted upon an agreed statement of facts. Each party asks for a directed verdict.

The defendant's first contention is that the information is defective and insufficient, because it alleges that each of the bottles shipped to the vendee was misbranded, whereas, it should have been alleged that the larger package, of which each bottle was a part, was misbranded.

A number of bottles of the article in question were shipped together as a single shipment. They went forward through the channels of interstate commerce as a single bundle or package, surrounded by some sort of a cover. The information charges that each individual bottle was mislabeled and misbranded, and not that the inclosing cover of all of the bottles was mislabeled or misbranded.

The first sentence of the second section of the Pure Food and Drugs Act provides: "That the introduction into any state or territory or the District of Columbia from any other state or territory or the District of Columbia, or from any foreign country or shipment to any foreign country of any article of food or drugs which is adulterated or misbranded, within the meaning of this act, is hereby prohibited." The paragraph then recites that "any person who shall ship or deliver for shipment from any state or territory or the District of Columbia to any other state or territory or the District of Columbia, or to a foreign country, or who shall receive in any state or territory or the District of Columbia from any other state or territory or the District of Columbia, or foreign country, and having so received, shall deliver, in original unbroken packages, for pay or otherwise, or offer to deliver to any other person, any such article so adulterated or misbranded within the meaning of this act" shall be punished as is thereinafter set forth. For the purposes of this case, the other portions of the section need not be noticed.

This section prohibits the introduction into interstate commerce of any article of food or drugs which is adulterated or misbranded within the meaning of the act. It also penalizes the shipment or delivery for shipment from any state or territory or the District of Columbia, of any such article so adulterated or misbranded within the meaning of the act. The verbs "ship" and "deliver" are both transitive, and call for an object. The object is found in the words, "any such article so adulterated or misbranded within the meaning of this act." The antecedent of "such" and "so" is found in the first sentence of the section, in the words, "any article of food or drugs which is adulterated or misbranded within the meaning of this act." If I should be wrong in this, and if the object of the transitive verbs, "ship" and "deliver" should be found further along in the section, in the words, "any such adulterated or misbranded food or drugs," the meaning would not be changed. I do not think, however, that I am mistaken as to the grammatical construction.

The section also imposes a penalty on the vendee or consignee who, having received, delivers in original unbroken packages for pay or otherwise, or offers to deliver to any other person, any article adulterated or misbranded within the meaning of the act. The law contemplates the punishment of two classes of persons. This construction accords with that put upon the section by the Supreme Court in Hipolite Egg Co. v. United States, decided March 13, 1911. In that case an adulterated article was involved. The court said: "Section 2 of the Food and Drugs Act prohibits the introduction into any state or territory from any other state or territory of any article of food or drugs which is adulterated, and makes it a misdemeanor for any person to ship or deliver for shipment such adulterated article, or who shall receive such shipment, or, having received it, shall deliver it in original unbroken packages for pay or otherwise."

It was also said in that case: "The object of the law is to keep adulterated articles out of the channels of interstate commerce, or, if they enter such commerce, to condemn them while being transported, or when they have reached their destination, provided they remain unloaded, unsold, or in original unbroken packages. These situations are clearly separate, and we cannot unite or qualify them by the purpose of the owner to be a sale."

It will furthermore be noted that the statute declares that it is one "for preventing * * * the transportation of adulterated or misbranded or poisonous or deleterious foods, drugs, medicines, and liquors, and for regulating traffic therein." The words, "package" and "original unbroken package," are both used in the act. The word "package" is not used in the same sense as "original unbroken package." The framers of the act manifestly had in mind the definition heretofore given by the courts to the term "original package," and in the second, third, and tenth sections have used that expression, or its equivalent. It is used in those sections with reference to the situations which arise where the article transmitted has reached the vendee or consignee, but has not yet become a part of the general property of the state in which the vendee or consignee lives. The package, still being unbroken, and not having become a part of the property of the state, remains subject to federal control. The article, if thus found, is subject to seizure, and may thereby be prevented from reaching the ultimate consumer. The word "package" is repeatedly used in this act without any modifying adjective or other qualifying term. It is in such instances to be taken in its broad sense. The word "package," as thus used, means the package made up by the manufacturer for sale to the ultimate consumer, which goes into the possession of the person who will use the article of food or drugs.

In the portion of section 7, which deals with drugs, the statute recites in the proviso: "That no drug defined in the United States Pharmacopœia or National Formulary shall be deemed to be adulterated under this provision if the standard of strength, quality, or purity be plainly stated upon the bottle, box or other container thereof although the standard may differ from that determined by the test laid down in the United States Pharmacopœia, or National Formulary." What does that language import, if it does not mean the particular receptacle of drugs which the person intending to use the

drug buys along with the drug, as its container? It means the bottle, or box, or other container, whatever it may be.

How can a person who wishes to buy a drug determine what the actual composition or character of the drug is, unless there be upon the bottle, or box, or paper, paste-board, or other container—i. e., on the package—of whatever material it may be, the information which the law says he shall have? The bottle, box, container, or package, whatever may be its form, may have reached the druggist incased in a great wooden box, for instance, along with a great number of other bottles, boxes, containers, or packages. The ultimate consumer may never see, and in fact rarely does see, the large box incasing the individual packages. The label or inscription put upon the large box—the box inclosing the bottles, boxes, or containers sold by the retailer—will afford no protection to the purchaser. He must look to the bottle, or box, or container that he buys for the thing that he buys.

The same section provides that food shall be considered adulterated: "If it contain any added poisonous or other added deleterious ingredient which may render such article injurious to health: Provided, that when in the preparation of food products for shipment they are preserved by any external application applied in such manner that the preservative is necessarily removed mechanically, or by maceration in water, or otherwise, and directions for the removal of said preservative shall be printed on the covering or the package, the provisions of this act shall be construed as applying only when said products are ready for consumption." This language recognizes that a food may, for its preservation in shipment, be packed in a preservative which may be removed so as to leave no deleterious or poisonous effects behind. If the shipper puts upon the covering or the package directions for the removal of the preservative, which enable the person who receives the article for use to bring it to a wholesome condition, the shipper does not become amenable to the law. The lawmakers, in the use of this language, had in mind the ultimate consumer, rather than the person who prepares the food for use for him.

The eighth section relates to misbranding. It recites: "That the term 'misbranded,' as used herein, shall apply to all drugs, or articles of food, or articles which enter into the composition of food, the package or label of which shall bear any statement, design or device regarding such article, or the ingredients or substance contained therein which shall be false or misleading in any particular," etc.

It is common knowledge that there are many articles of food and drugs found in the hands of grocers or druggists, which the individual buys for use by himself or his family. It is from the package he buys, from the label upon such package, that he learns what the article is. If the label or brand upon it is misleading, an offense is committed. The package may have been shipped along with many other packages of the same kind in a large inclosing box or case. It is not such inclosing box or case to which the consumer looks, or about which he inquires for information.

The same section, in referring to drugs, provides that they shall be deemed to be misbranded: "If the contents of the package as originally put up shall have been removed, in whole or in part, and other contents shall have been placed in such package, or if the package fail to bear a statement on the label of the quantity or proportion of any alcohol, morphine, opium  *   *   *   or any derivative or preparation of any such substances contained therein."

To what package does the statute allude? Manifestly, the package that the consumer buys, the package which goes into his possession, the package originally put up for sale and use. Under the provisions relating to the misbranding of foods, the same section (section 8) recites that an article of food shall be deemed to be misbranded: "If it be labeled or branded so as to deceive or mislead the purchaser, or purport to be a foreign product when not so, or if the contents of the package as originally put up shall have been removed in whole or in part and other contents shall have been placed in such package, or if it fail to bear a statement on the label of the quantity or proportion of any morphine, opium,  *   *   *   contained therein."

The word "purchaser," it will be noted, is used without limitation or qualifying terms. The language quoted does not say the wholesale, retail, or in-

dividual purchasers. It does not say the purchaser who buys in order to utilize the article in some process of further manufacture or to sell to retailers. If it be broad enough—and I do not say that it is not so—to include wholesale and retail purchasers, it is also broad enough to include the ultimate consumer as a purchaser, and the labeling or branding of the particular package, box, bottle, or other container inclosing the article which he buys must be such as not to deceive or mislead him. It will not do to say that this law was framed to protect wholesalers and retailers and not the common people. Its primary purpose is the protection of the ultimate consumer.

The same section further provides that an article of food shall be deemed adulterated:

"Third. If in package form and the contents are stated in terms of weight or measure, they are not plainly and correctly stated on the outside of the package.

"Fourth. If the package containing it or its label shall bear any statement, design, or device regarding the ingredients or the substances contained therein, which statement, design or device shall be false or misleading in any particular: Provided, that an article of food which does not contain any added poisonous or deleterious ingredients shall not be deemed to be adulterated or misbranded in the following cases:

"First. In the case of mixtures or compounds which may be now or from time to time hereafter known as articles of food, under their own distinctive names, and not an imitation of, or offered for sale under the distinctive name of another article, if the name be accompanied on the same label or brand with a statement of the place where said article has been manufactured or produced.

"Second. In the case of articles labeled, branded, or tagged so as to plainly indicate that they are compounds, imitations or blends, and the word 'compound,' 'imitation,' or 'blend,' as the case may be, is plainly stated on the package in which it is offered for sale; provided," etc.

The law does not mean that when a number of bottles or boxes are put into the channels of commerce as a single shipment, incased together in a wooden box, for instance, that the aggregate weight of all the inclosed bottles or boxes, or of each individual inclosed bottle or box shall be placed upon the inclosing wooden box and need not be placed on the individual inclosed bottles or boxes.

In whose favor does the prohibition run against any false or misleading statement, design, or device on the package or its label, regarding the ingredients or the substances contained therein? For whose benefit is the provision for labeling, branding, or tagging of articles so as to indicate that they are compounds, imitations, or blends, made? The answer to these questions, to my mind, is clear. It is the purchasing public, the ultimate consumer, whom the provisions of the statute are primarily intended to protect. Without enlarging further, I am convinced that the word "package," as used in it, means the package which passes into the possession of the public, of the real consumer; and that the words, "original unbroken package," relate, as heretofore stated, to the package in the form in which it is received by the vendee or consignee. The objection to the information thus far considered is not well taken.

The remaining question is this: Is a reputable, regularly licensed, practicing physician, residing in Ohio, who prescribes for a person beyond the limits of the state and transmits to such person through the channels of interstate commerce the medicine prescribed, subject to the penalties of the law, if the medicine so prescribed and so passing through the channels of interstate commerce, contains morphine—the bottle, box, container, or package inclosing the medicine so prescribed and to be taken by the patient, not being so labeled as to show the presence of that drug? The defendant is engaged in the business of treating persons enslaved by the morphine, cocaine, and other drug habits.

In the course of the argument reference was made to the debates in the House of Representatives when the Pure Food and Drugs Act was under con-

sideration and when amendments were offered and voted down to exempt from the provisions of the act the prescriptions of regularly licensed and practicing physicians. The statute, like a written instrument, is to be construed by its express terms, from its four corners, as it is frequently expressed. It is said in 26 Am. & Eng. Ency. of Law, 638, 639, that the opinions of individual legislators as to the object and effect of a statute are of little or no weight on questions of construction, and are generally inadmissible; and that, while it is unquestionably a general rule that what may be called the legislative history of an act is not admissible to explain its meaning, yet in cases of doubt and ambiguity the journals of the Legislature may be examined for the intent of the lawmakers to ascertain facts of which such journals are evidence. In view of the principle announced in United States v. Delaware & Hudson Co., 213 U. S. 366, 414, 29 Sup. Ct. 527, 53 L. Ed. 836, the fact that Congress refused to incorporate in the Pure Food and Drugs Act a provision permitting regularly licensed and practicing physicians to send their medicines containing morphine, cocaine, and like drugs, through the channels of interstate commerce without so labeling them as to show the presence of such drugs, is practically conclusive that it was the intention of Congress that physicians should not enjoy such a privilege.

The act under consideration, however, is not so obscure as not to be susceptible of interpretation without recourse to the journals of Congress. It makes no exemption in favor of regularly licensed practicing physicians. The purpose of the law is to prevent deceit and false pretenses in the sale of foods and drugs, and to protect the public. It is aimed at imitations, shams, frauds, and pretenses of every character as regards articles of food and drugs. Its purpose is to apprise people who buy and use drugs as to what they buy and use, and to check the use of drugs which lead to destructive habits.

In the case at bar the prescription was given to correct the morphine habit. The agreed statement of facts recites that the best way to cure such a habit is by administering, without the knowledge of the patient, morphine in steadily diminishing quantities until finally none at all is given. It is urged that, if a physician may not thus prescribe, he may be thwarted in his treatment of his patient, and that thus the law will operate to the detriment of the morphine victim. The court is therefore asked so to temper the law, so to construe it, as to permit a physician of the character above and in the agreed statement of facts named to prescribe for his patients and transmit to them medicine through the instrumentalities of interstate commerce, without apprising the patients of their use of morphine, cocaine, and other drugs named in the act.

This, however, is asking the court to read into the law a provision not therein contained. If the requested construction be placed upon it, then in every case the question will arise: Is the physician who prescribes regularly licensed, practicing, and reputable? The effect of the construction asked would be so to open the door as to permit disreputable physicians, "quacks," and the manufacturers and vendors of proprietary medicines, to place their prescriptions in the possession of the people, and thus to continue the growth of the very drug habits which the law is designed to check. In the absence of any provision which exempts a regularly licensed, practicing and reputable physician from sending his medicines or prescriptions through the channels of interstate commerce to his patients without labeling or branding them so as to show precisely what their contents are, I am of the opinion that such physicians are not exempt from the provisions of the act, and that a failure on the part of the defendant so to label its medicines or prescriptions as to show that one of the ingredients is morphine, constitutes an offense. If the law as it stands operates injuriously, relief should be sought from Congress, and not from the courts.

One of the reasons for requiring the labeling or branding to show the presence of morphine, cocaine, and articles of like nature is that people may not become addicted to the use of such drugs without knowingly acquiring the habit of using them. Medicines or prescriptions might otherwise be taken by them without knowledge of their real contents and ultimately the users have

fixed upon them a habit which destroys both health and life. The law is far-reaching, but it was intended to be so.

Another question presented is whether the Pure Food and Drugs Act deals with articles other than those which are the subject of bargain and sale. It is urged that the medicine or prescription is a mere incident of the services rendered, and that it is not therefore to be treated as an article of commerce. There are some sections of the act, as the third, which use the words "sale, or offered for sale." If a master employs a servant, he buys the servant's labor and the servant sells it. If a client employs a lawyer, he buys the lawyer's services. The lawyer sells his services, his learning, his skill. The client buys what the lawyer offers to sell. A physician holds himself out as ready to serve others for a consideration. In a sense he sells his services to his patient. It is common knowledge that a physician rendering services to a patient also furnishes a considerable part, and sometimes all of the medicine taken by the patient. The medicine is furnished along with, under, and as part of the contract of employment. In cities the physician may write a prescription to be filled at a drug store, and yet it is within the knowledge of all that physicians in calling upon patients ordinarily carry with them some medicine at least for administration. There are instances, especially in cities, in which there is a separation of the drugs furnished from the employment. The patient then pays for the drugs in addition to the services rendered by the physician. But I do not understand from the agreed statement of facts that such a situation is presented in this case. The employment which a physician accepts is contractual in its nature and is sufficiently of the nature of bargain and sale to avoid the argument which is made. Moreover, the statute (section 2) prohibits the introduction into any state or territory or the District of Columbia from any other state or territory or the District of Columbia, or from any foreign country, or shipments to any foreign country, of any article of food or drugs which is adulterated or misbranded within the meaning of the act.

As was said in the Hipolite Egg Co. Case, the object of the law is to keep adulterated and misbranded articles out of the channels of interstate commerce, and it is immaterial whether the medicine or prescription which was furnished by the defendant company was the mere incident of the employment, or its primary object. It is enough to know that the medicine or prescription was sent through the channels of interstate commerce, and misbranded, within the terms of the act. The information is sufficient.

On the facts submitted, the defendant violated the law, and it is therefore my duty, gentlemen of the jury, to direct you to return a verdict in favor of the government.