TUCKER et al. v. WILLIAMSON, Internal Revenue Collector, et al.

(District Court, S. D. Ohio, E. D. December 7, 1915.)

No. 50.

1. STATUTES ☞217—CONSTRUCTION—EXTRINSIC AIDS TO CONSTRUCTION.

In construing an act of Congress, while the court may not recur to the views of individual members expressed in debate, nor consider the motive which influenced them in voting, it may consider the history of the times to ascertain the reason for the legislation and under appropriate circumstances the mode in which particular language was introduced into the law as shown by the journals and records.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 293; Dec. Dig. ☞217.]

2. POISONS ☞2—HARRISON NARCOTIC ACT—CONSTRUCTION.

Harrison Narcotic Act Dec. 17, 1914, c. 1, § 2, 38 Stat. 786, makes it unlawful for any person to sell, barter, exchange, or give away any of the drugs mentioned in the act, except in pursuance of a written order of the person receiving the same on a prescribed form, a copy of which order shall be preserved by both seller and buyer for two years, subject to inspection, etc., but provides in section 2a that registered physicians, dentists, and veterinary surgeons who in the course of their professional practice "shall have been employed to prescribe for the particular patient receiving such drug" shall be exempted from such requirement, but shall "keep a record of all such drugs dispensed or distributed, * * * except such as may be dispensed or distributed to a patient upon whom such physician * * * shall personally attend." *Held* that, under such provisions, a physician is not prohibited from dispensing or distributing in the course of his professional practice and without a written order a narcotic to a patient employing him because of the fact that he does not personally attend such patient, but that in such case he is required to keep the prescribed record.

[Ed. Note.—For other cases, see Poisons, Cent. Dig. § 1; Dec. Dig. ☞2.]

3. PHYSICIANS AND SURGEONS ☞6—"PRACTICE OF MEDICINE"—STATUTORY DEFINITION.

Under Gen. Code Ohio, § 1286, a person who examines patients, diagnoses their diseases, and then prescribes and sells his own proprietary remedies is engaged in the practice of medicine, although his ostensible and apparent motive may be the sale of his medicines, and he is subject to the laws of the state regulating such practice.

[Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. §§ 6-11; Dec. Dig. ☞6.

For other definitions, see Words and Phrases, First and Second Series, Practice of Medicine.]

4. POISONS ☞2—HARRISON NARCOTIC ACT—CONSTRUCTION.

The provisions of Harrison Narcotic Act Dec. 17, 1914, exacting a license as a condition for the sale, dispensing or distribution of drugs are not an exercise of the police power, but are for the purpose of revenue, and such license is a mere form of imposing a tax, and implies nothing more than that the licensee shall not be subject to the penalties of the act.

[Ed. Note.—For other cases, see Poisons, Cent. Dig. § 1; Dec. Dig. ☞2.]

5. POISONS ☞2—HARRISON NARCOTIC ACT—CONSTRUCTION—VALIDITY OF DEPARTMENTAL REGULATIONS.

While the Harrison Narcotic Act of December 17, 1914, permits a physician in the course of his professional practice to dispense and distribute the mentioned narcotics to a patient by whom he is employed to prescribe,

,without being subject to the prescribed regulations, although he does not personally attend such patient, the act must be construed with reference to the known usages and modes of practice in the profession, in which the prescribing for patients without personal examination is the rare exception and not the rule; and under the provisions of section 1, requiring the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury to "make all needful rules and regulations for carrying the provisions of this act into effect," the Commissioner has authority to prescribe what shall constitute "personal attendance" and "professional practice" by a physician within the meaning of the act, and a regulation which denies the right of registration and exemption to one who, although a licensed physician, does not see most of his patients, who bases most of his prescriptions on their written statements sent to him through the mails, and who prescribes the same remedy for all alike, is within the power conferred and valid.

[Ed. Note.—For other cases, see Poisons, Cent. Dig. § 1; Dec. Dig. ☞2.]

In Equity. Suit by Nathan Tucker and William B. Robinson against Beriah E. Williamson, Collector of Internal Revenue for the Eleventh District of Ohio, and others. On motion to dismiss bill. Motion sustained.

A motion is made to dismiss the bill, whose averments, as far as need be noted, are as follows: Both of the plaintiffs are graduates of medical schools. Each is a member of his county and state medical society. One has been engaged for 48 years as a physician in lawful practice, and the other for 19 years. Both are duly licensed to practice medicine in Ohio, and each has registered as required by the act of Congress of December 17, 1914, known as the Harrison Narcotic Law. Each has paid the special tax required by that law. In the course of their professional practice only they have been and are prescribing for, dispensing and distributing to various patients, numbering many thousands, and residing in various states, a certain medicine prepared by them for the relief of asthma and hay fever, which medicinal preparation contains cocaine. They do not personally attend all of their patients for and to whom they thus prescribe, dispense, and distribute such preparation, but in most instances prescribe for such patients and dispense and distribute such medicinal preparation to them upon the written statements of such patients to plaintiffs, describing and setting forth their respective symptoms and conditions. Since March 1, 1915, and for many years prior thereto, plaintiffs have kept a complete record showing the amount of all the drugs mentioned in section 1 of the act in question, dispensed or distributed, the date thereof, and the name and address of each patient to whom such drugs have been dispensed or distributed, and still keep such record as required by the act. The amount of cocaine in each dose does not exceed .001 of a grain. The preparation is distinctly alkaline. The greater per cent. of cocaine used in it is in the form of the decomposition products of cocaine, and not as cocaine per se; such cocaine being denatured as to its habit-forming or habit-satisfying qualities. As partners and jointly the plaintiffs, by means of the order forms prescribed by the act, have in their possession cocaine, for the sole purpose of its use, sale, and distribution by them and each of them in the lawful practice of their profession as physicians, and have made and preserved duplicates of such orders upon the form issued for that purpose by the Commissioner of Internal Revenue. Their medicinal preparation must be kept for a suitable length of time to perfect the same as a useful medicine for the treatment of asthma and hay fever patients. If the supply now on hand should be seized and destroyed, it will prevent them from continuing to prescribe for and treat their patients, and will cause irreparable loss to them and each of them. The collector of internal revenue for this district, and other internal revenue officers, acting under the instruction of the Commissioner of Internal Revenue, dated June 10, 1915, will, unless restrained by the court, seize and forfeit all of the medicinal preparation and

all medicines containing cocaine now in the possession of the plaintiffs, and will recommend to the district attorney the names of the plaintiffs for indictment and prosecution. The plaintiffs, on September 10, 1915, were notified by the Acting Commissioner of Internal Revenue that their practice of sending out a preparation containing cocaine to patients which such physicians have never seen is considered by such Commissioner to be an illegitimate practice of medicine, and in direct violation of the intents and purposes of the Harrison Anti-Narcotic Law, particularly of section 2, and should be stopped, and that a copy of his notification had been furnished to the district attorney and the revenue agents. The plaintiffs are engaged in the practice of their profession as physicians, conducted according to law, and are prescribing for and dispensing and distributing to their patients the above-named medicinal preparation, and have a large and valuable practice among such patients, and, if the orders of the Commissioner of Internal Revenue are enforced against them, they will suffer irreparable injury, loss, and damage, unless the defendants (the internal revenue collector and other revenue officers whose names are unknown) are restrained from seizing and forfeiting the plaintiffs' medicines, drugs, and medicinal preparation now in their possession and adapted to, needed for, and used in the treatment of their patients. It is charged that the proposed acts of the defendants will be illegal, unauthorized, and in violation of the Constitution and laws of the United States, and of plaintiffs' rights, and that the act in question is unconstitutional and void as applied to the plaintiffs or either of them in connection with their practice as physicians, in that it attempts to regulate the prescribing, dispensing, and distributing of the drugs mentioned in it within the state of Ohio. The order of the Commissioner of June 10, 1915 (hereinafter mentioned), is also alleged to be without authority of law and void, in that (1) it holds that a physician can prescribe such drugs only when he personally attends upon his patients in the course of his professional practice; (2) it attempts to invest the collector of internal revenue with a power of discrimination as to the registration of certain named persons; (3) it holds that, if parties secure registration, such registration may be null and void, and does not protect them from prosecution for the use of the prohibited drugs mentioned in the act, upon the claim that the registration was obtained through misrepresentation or fraud; (4) the order attempts to authorize and direct the collector and other internal revenue officers to seize and forfeit prohibited drugs in the possession of citizens of the United States within the district; (5) it directs the collector and other internal revenue officers to recommend persons to the district attorney for indictment and prosecution; (6) it directs the collector and other internal revenue officers to seize and proceed to forfeit drugs prescribed or distributed on receipt of mail orders received from patients, or which are designed to be so prescribed and distributed. The prayer is for a restraining order and for ultimate injunctive relief.

Section 1 of the act provides, with certain exceptions which need not now be noted, for the registration and the payment of a special tax of $1 by "every person who produces, imports, manufactures, compounds, deals in, dispenses, sells, distributes, or gives away opium or cocoa leaves or any compound, manufacture, salt, derivative, or preparation thereof." Cocaine is one of the specified salts. Failure on the part of any such person so to register or pay the special tax is specifically declared to be unlawful. The word "person" is made to include a partnership. The provisions of existing revenue laws relating to the special tax, so far as applicable, including the provision of section 3240, R. S. U. S., are extended to the special tax imposed by the act. The Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, is required to make all needful rules and regulations for carrying the provisions of the act into effect. The first paragraph of section 2 makes it unlawful for a person to sell, barter, exchange, or give away any of the drugs mentioned in the act, except in pursuance of a written order of the person to whom such article is sold, bartered, exchanged, or given, on a form to be issued in blank for that purpose by the Commissioner of Internal Revenue. It further requires the person who accepts such order to preserve the same, and also the person who gives it (if it be accepted) to preserve a

copy of the same, for a period of two years in such a way as to be readily accessible to inspection of any officer, agent, or employé of the Treasury Department duly authorized for that purpose; but section 2 (a) declares that nothing contained in the section (and consequently the foregoing provisions also relating to the preservation of orders and copies of orders) shall apply to the dispensing or distribution of any of such drugs by a physician registered under the act in the course of his professional practice only: Provided, that such physician keeps a record of all such drugs dispensed or distributed, showing the amount dispensed or distributed, the date, and the name and address of the patient to whom the drugs are dispensed or distributed, except such as may be dispensed or distributed to a patient upon whom such physician shall personally attend—such record to be kept for two years from the date of the dispensing or distributing of such drugs, subject to inspection as above provided. Section 2 (d) provides for the sale of blanks by the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, and the sale of them by collectors of internal revenue. It requires collectors, before delivery of any such blanks, plainly to write or stamp on them the name of the purchaser, and declares it to be "unlawful for any person to obtain by means of said order form any of the aforesaid drugs for any purpose other than the use, sale or distribution thereof by him in the conduct of a lawful business in said drugs or in the legitimate practice of his profession." Section 4 first declares in comprehensive language who may not send, ship, carry, or deliver any of the drugs mentioned in the act, and then excepts from such broad provision "any person who shall deliver any such drug which has been prescribed or dispensed by a physician * * * required to register under the terms of this act, who has been employed to prescribe for the particular patient receiving such drug." Section 7 provides that all laws relating to the assessment, collection, remission, and refund of internal revenue taxes, including section 3229, R. S. U. S. (Comp. St. 1913, § 5952), so far as applicable to and not inconsistent with the provisions of the act in question, are extended and made applicable to the special tax imposed by it. Section 8 specifies the persons as to whom it shall be presumptively unlawful to have any of such drugs in his possession. The section is then made inapplicable (1) "to any employé of a registered person;" (2) "to a nurse under the supervision of a physician * * * registered under this act, having such possession or control by virtue of his employment or occupation and not on his own account;" or (3) "to the possession of any of the aforesaid drugs which has or have been prescribed in good faith by a physician * * * registered under this act." Section 9 imposes on violators of the law, upon conviction, a fine of not more than $2,000, or imprisonment for not more than five years, or both, in the discretion of the court.

The ruling announced by the Commissioner of Internal Revenue and the Secretary of the Treasury on June 10, 1915, and of which complaint is made, is, in substance, as stated in this paragraph, and is as follows: The limitation of registration to certain named persons indicates the vesting of a power of discretion in collectors of internal revenue as to who shall register and from whom the special tax may be received. Persons not legitimately engaged in the exercise of their trade or profession cannot legally register under the terms of the act. From the express language of the act, a physician can register and dispense the drugs embraced in the act "in the course of his professional practice only." He can prescribe such drugs when he "has been employed to prescribe for the particular patient receiving such drugs," and upon whom he "shall personally attend in the course of his professional practice only." Such prescriptions must be made "in the legitimate practice of his profession," and then only when "employed to prescribe for the particular person (patient) receiving such drugs." The duties of collectors of internal revenue do not end, under the provisions of the act, with simple registration. If parties secure registration through misrepresentation or fraud, such registration is null and void, and does not protect them from prosecution for the illegal use of the drugs, and it is the duty of collectors, when such cases are discovered, to investigate the same, and, when the law has been violated in line with the foregoing, to seize and proceed to forfeit the prohibited drugs illegally in posses-

sion of such parties, and recommend such persons to the district attorney for indictment and prosecution. The collectors were informed that the foregoing "has special application to those persons who, registering as physicians, prescribe or distribute narcotic drugs or preparations on receipt of mail orders received from so-called patients, or who, under the laws of the state or under municipal regulation, are not permitted to practice medicine."

Vorys, Sater, Seymour & Pease, of Columbus, Ohio, for plaintiffs.
Stuart R. Bolin, U. S. Dist. Atty., of Columbus, Ohio, for defendants.

SATER, District Judge (after stating the facts as above). To determine all of the points argued may result in the decision of matters not altogether germane to the issue presented. The facts well pleaded are admitted by the motion. If they do not state a cause of action, the motion must prevail.

Most of the plaintiffs' business is a mail order business. Whether the mails or express companies are utilized in transmitting their preparation to patients does not appear, but the employment of one or both of such agencies is obviously necessary. The preparation is sent to all alike. A "preparation" is something which is of use, or believed by the prescriber or user fairly and honestly to be of use, in curing, alleviating, or palliating or preventing, some disease or affection. Dodge & Olcott v. U. S. (C. C.) 130 Fed. 624, 625. The bill does not state in what manner plaintiffs are compensated, whether by the receipt of fees, as is usual with medical practitioners, or merely by payment for the preparation forwarded, nor does the bill show that the partnership of which plaintiffs are members has registered under the Narcotic Law.

[1] In the argument of the case, reliance was placed on the utterances of members of the Senate when the bill was under consideration. In construing the act the court may not recur to the views of individual members in debate, nor consider the motives which influenced them to vote for or against its passage. The act itself speaks the will of Congress, and this is to be ascertained from the language used. In construing it, however, the court may with propriety recur to the history of the times in which it was passed. This is frequently necessary to ascertain the reason as well as the meaning of the particular provisions in it. U. S. v. Union Pac. R. Co., 91 U. S. 72, 79, 23 L. Ed. 224; U. S. v. Freight Ass'n, 166 U. S. 290, 318, 319, 17 Sup. Ct. 540, 41 L. Ed. 1007; Hudson v. Chicago, St. P., M. & O. Ry. Co. (D. C.) 226 Fed. 38. Under appropriate circumstances, the legislative intent may be ascertained and carried out by a recurrence to the mode in which particular language of an embarrassing nature was introduced into a law as shown by the journals and records (Blake v. National Banks, 23 Wall. 307, 319, 23 L. Ed. 119), and to inform the court of the exigencies calling for the enactment of the law and the reason for inserting given provisions. American Net & Twine Co. v. Worthington, 141 U. S. 468, 473, 12 Sup. Ct. 55, 35 L. Ed. 821. The act is a revenue measure. The large and increasing number of persons addicted to the use of cocaine, and its demoralizing and de-

structive effect on them, abundantly justifies the restrictive conditions imposed on those who qualify to conduct business under the law. ·

[2] Counsel have presented the bill, which in a modified form became the present act, as it·was ordered to be printed on August 18, 1914, by the House of Representatives, with the amendments of the Senate numbered. When the bill went to the Senate after it had passed the House, the proviso is section 2 (a) read as follows:

"Provided, however, that such physicians, dentists, or veterinary surgeons shall personally attend upon such patient."

The Senate struck out the words "however" and "personally attend upon such patient," and by amendment the proviso was made to read as appears from the discussion in the Senate (Cong. Rec. vol. 51, p. 6788):

"Provided, that such physician, dentist, or veterinary surgeon shall have been specially employed to prescribe for the particular patient receiving such drug or article: and provided further, that such drug shall be dispensed in good faith and not for the purpose of avoiding the provisions of this act."

The words "specially" and "or article" were subsequently eliminated by the Senate. The bill later went to a committee of conference, consisting of three managers on the part of the House and five on the part of the Senate. On December 10, 1914, the committee reported and recommended (Cong. Rec. vol. 52, pp. 97, 98, 99) that the House recede from its disagreement to the Senate amendment No. 8 (being all the proviso following the words "that such physician, dentist, or veterinary surgeon shall") and agree to the same with an amendment as follows:

"Strike out all the matter inserted by said amendment and insert in lieu thereof the following:  'Keep a record of all such drugs dispensed or distributed, showing the amount dispensed or distributed, the date, and the name and address of the patient to whom such drugs are dispensed or distributed, except such as may be dispensed or distributed to a patient upon whom such physician, dentist, or veterinary surgeon shall personally attend;  and such record shall be kept for a period of two years from the date of dispensing or distributing such drugs, subject to inspection, as provided in this act.' "

The recommendation thus made was adopted by both legislative bodies, and the bill as thus amended became section 2 (a) of the act in question. The statement of the House managers, made to the House of Representatives, in explanation of the effect of the action agreed upon by the conferees and recommended in the report, is as follows:

"Amendment No. 8: This amendment as redrafted does not require the personal attention of a physician, dentist, or veterinary surgeon to dispense or distribute any of the aforesaid narcotics, but, in case there is not personal attention on the part of the physician, dentist, or veterinarian, a record showing the amount of the drug dispensed or distributed, the date, the name and the address of the patient to whom such drug was dispensed or distributed, must be kept for a period of two years, subject to inspection by the officers, agents, and employés of the Treasury Department, and by the state, territorial, district, municipal, and insular officials named in this act. Physicians, dentists, and veterinary surgeons will not have to keep a record of the quantity of the drug administered, etc., when in personal attendance upon their patients."

The construction thus placed upon section 2 (a) is not controlling, but the foregoing shows how such section came to be made a part of the law. The exemption authorized by the bill, as it passed the House, from the requirements of the first paragraph of section 2, extended only to instances of personal attendance on patients. That provision was rejected and in lieu thereof the exemption was extended, by the agreement of the conference committee and the approval of both branches of Congress, so as to include not only cases of personal attendance on the part of the physician, but also those cases in which there is no personal attendance, providing a record is kept in such latter instance of the drug or drugs dispensed. There was thus somewhat of an enlargement of the instances of exemption from the requirements of the first paragraph of section 2 as to the preserving of orders and duplicates of the same, but there was added the duty of preserving a record in case of dispensing or distributing when not in personal attendance on the patient. The proviso must be interpreted as it now stands, not as it stood when the bill came to the Senate from the House. U. S. v. Delaware & Hudson Co., 213 U. S. 366, 414, 29 Sup. Ct. 527, 53 L. Ed. 836; Dr. J. L. Stephens Co. v. U. S., 203 Fed. 817, 823, 122 C. C. A. 135; Bate Refrigerating Co. v. Sulzberger, 157 U. S. 1, 57, 15 Sup. Ct. 508, 39 L. Ed. 601; Cooper v. Richmond (C. C.) 42 Fed. 697, 700, 8 L. R. A. 366; Sutherland, Stat. Const. (2d Ed.) § 351. So interpreting it, it must be held that a physician is not required to keep a record of the drugs dispensed or distributed in good faith, or to preserve the orders received or the duplicates of the same, when in the course of his professional practice he is in personal attendance on his patients.

[3] In view of section 1286, G. C. Ohio, the plaintiffs are engaged in the practice of medicine. Under the state rule, if a person examines patients, diagnoses their diseases, and then prescribes and sells his own proprietary remedies, he is practicing medicine, notwithstanding his ostensible and apparent motive may be the sale of his medicines. Taylor's Law in Relation to Physicians, 39; State v. Van Doren, 109 N. C. 684, 14 S. E. 32; Wharton & Stillé's Med. Jur. vol. 3, § 452. The tendency on the part of the states is to extend rather than to restrict the definition of the term "practicing medicine" (Taylor, supra, 39), and for the manifest purpose of protecting their citizens and rendering amenable to law all practitioners who violate its provisions or are guilty of imposition or other reprehensible conduct.

[4] Legislation by the states regarding the practice of medicine is a valid exercise of the police power. Hawker v. N. Y., 170 U. S. 189, 191–193, 18 Sup. Ct. 573, 42 L. Ed. 1002; Reetz v. Michigan, 188 U. S. 505, 506, 23 Sup. Ct. 390, 47 L. Ed. 563; Collins v. Texas, 223 U. S. 288, 32 Sup. Ct. 286, 56 L. Ed. 439; Meffert v. State Board of Medical Registration, 66 Kan. 710, 72 Pac. 247, 1 L. R. A. (N. S.) 811, affirmed 195 U. S. 625, 25 Sup. Ct. 790, 49 L. Ed. 350. The exaction by the national government, however, of a license, as a condition for the sale, dispensing, or distribution of drugs, like that for the sale of intoxicating liquor, is not an exercise of the police power, but is for the purpose of revenue. Re Heff, 197 U. S. 488, 505, 25 Sup. Ct. 506, 49 L.

Ed. 848. A license to dispense the drugs named in the act must be regarded as nothing more than a mere form of imposing a tax, and as implying nothing more, except that the licensee shall not be subject to the penalties of the law if he pays such tax and conforms to legal requirements. License Tax Cases, 5 Wall. 462, 471, 18 L. Ed. 497.

[5] The only physician that may under section 2 (a) lawfully dispense or distribute the drug in question is one who is registered and who acts in the course of his professional practice only. He may not —section 2 (d)—obtain it by means of the prescribed order forms for any purpose other than the use, sale, or distribution of it in the legitimate practice of his profession. That he must in each instance in which he dispenses or distributes the drug be employed to prescribe for the particular patient receiving such drug is necessarily implied from the pertinent provisions of the act and the purpose to be accomplished by it. He may not engage in the business of selling, unless he sells it in filling his own prescriptions, for the sale of it is, generally speaking, the part of the druggist. He must act strictly within the line of actual employment in a legitimate and professional practice only, in which (adopting the definition of the practice of medicine as found in Underwood v. Scott, 43 Kan. 714, 23 Pac. 942) he personally judges (diagnoses) the nature, character, and symptoms of the disease, determines the proper remedy for it, and prescribes the application of the remedy to the disease. Personal investigation precedes and personal supervision accompanies the prescribing. The remedy is to be adapted to the disease and wants of the particular patient. That a physician may not prescribe for other than the particular patient that employs him and that is to receive the drug follows from the language and import of sections 4 and 8. The proviso of section 4 makes lawful the sending, shipping, carrying, or delivery of the drug (1) by common carriers engaged in transporting it, and (2) by any employé (acting within the scope of his employment) of any person who shall have registered and paid the special tax; but that section, when it treats of physicians, deals only with the delivery of the drug and permits its delivery by a person (an individual) only when it has been prescribed or dispensed by a registered physician who has been employed to prescribe for the particular patient who is to receive such drug. The law contemplates that there shall be no promiscuous or covert passing around of the drug to persons who have not employed the physician and received it on his prescription. The proviso of section 8, whose validity and scope need not now be considered, makes possession of the drug by an unregistered person who has not paid the tax, other than an employé of a registered person, or a nurse under the supervision of a registered physician, presumptive evidence of a violation of the act, unless such possessor shall have obtained a prescription made in good faith from a registered physician.

The regulation promulgated by the Treasury Department that a physician must be actually absent from his office and in personal attendance upon a patient in order to come within the exemption of section 2 (a) accords with the design that a physician shall maintain supervision over the patient for whom he prescribes. One of the defi-

nitions of "attend" (Latin, "attendere"), given in Webster's International Dictionary is: "To visit professionally, as a physician." The Department thus places (and, I am disposed to think, rightfully so) a more restricted meaning on personal attendance than the courts have placed on medical attendance—it being held that to constitute the latter it is not requisite that the physician should attend the patient at his home and that an attendance at his office is sufficient. Cushman v. Insurance Co., 70 N. Y. 72; Gilligan v. Royal Arcanum, 26 Ohio Cir. Ct. 42, 43. It is by personal attendance that the greater part of the business of a regularly practicing general practitioner is done. The personal attendance clause, therefore, covers the majority of all of the cases in which the drug is dispensed or distributed by such a physician. Its effect is to increase the inconvenience and difficulty, and even the expense, of procuring the drug. In harmony with this view is the provision of section 2 (b), which does not permit the filling of prescriptions unless they are written and signed and dated as of the day on which they are signed. The refilling of prescriptions is not permissible. If, instead of personal attendance on a patient by the physician, the patient calls on the physician at his office for. treatment, in which event such physician is required to make a record of the drugs mentioned in the act which he dispenses or distributes, the opportunity is afforded of personally diagnosing, studying, supervising, and prescribing for such patient. If a regularly practicing physician may prescribe without seeing his patient, it is in occasional instances only.

The responsibility cast upon the physician is great and the law consequently exacts of him a high degree of integrity—practices which are both professional and legitimate. Even a layman knows that the diagnosis of diseases has in recent years assumed increased and increasing importance for the purpose of determining and removing their causes. The ascertainment of the blood pressure, the analysis of the blood, urine, and stomach contents, the employment of the X-ray and of other appliances and modes of examination for the determination of the physical condition of patients, are so usual and so much more assuring than a patient's recital of what may be merely subjective symptoms, that skillful and conscientious physicians have come to use, and intelligent people have come to expect, an exaction of the full history of each case and the use of scientific methods in determining the presence or absence of disease and its stage of advancement. Such methods enable the physician to work with greater precision to remove the causes of disease. If he acts only on the patient's statement, however honestly made, he may be misled, or treat a sympton and not the disease itself, whether that statement be oral or in writing, and if in writing, and the patient be not seen at all, the prescription sent may· not only be an inappropriate remedy, but may reach another for whom the physician did not intend it and of whom he never heard.

In the enactment of legislation the law-making body may take into account the advance of learning, and provide for the public health and safety by such reasonable and proper measures as increased knowledge may suggest (State v. Gravett, 65 Ohio St. 289, 300, 62 N. E.

325, 55 L. R. A. 791, 87 Am. St. Rep. 605), and may impose new conditions as prerequisite to the practice of medicine as new modes of treating disease are discovered. The statute must be construed with reference to known usages and modes of transacting business (Shoemaker v. Goshen Township, 14 Ohio St. 569, 584), as well as the history of the times (Preston v. Bowder, 1 Wheat. 115, 120, 121, 4 L. Ed. 50), and for the benefit of the community at large (Allen v. Little, 5 Ohio, 66, 72). Although a revenue measure, the provisions of the act defining who may practice under it tend to reduce to a minimum (if it does not wholly eliminate) the number of prescriptions for unfortunate cocaine addicts which are not made in cases of personal supervision, when the patient calls on the physician or the physician on the patient. The physician must, if practicable, prescribe with reference to knowledge personally acquired by seeing his patient. To prescribe, in most instances, for absent patients, on their written statements describing their respective symptoms and conditions, and in every instance to send the same medicinal preparation—a sort of proprietary medicine—is to reverse the policy of the law, make an exception the rule, open the door to fraud, and frequently to furnish treatment which may be hurtful or wholly ineffectual. That the purpose of the law may not fail, the act forbids the registration of and imposes penalties upon physicians who engage in other than legitimate and professional practice, and has cast, or at least has attempted to cast, upon the Commissioner of Internal Revenue and the Secretary of the Treasury the power of defining in what such practice consists.

The provisions of the act that are directed toward physicians are also made applicable to dentists and veterinary surgeons. A veterinarian, as defined by the Century Dictionary, is:

"One who practices the art of treating diseases and injuries of domestic animals, surgically or medically."

It would seem that no veterinarian can legitimately or in the course of his professional practice only prescribe for a human being, because his patients are domestic animals. The veterinarian of necessity almost always treats his patients when away from his office and when personally attending them. The advance made in dentistry in recent years requires the giving of prescriptions to a considerable extent in dental surgery and for the removal of the causes of diseases of the teeth and mouth, but cases of dental surgery are usually treated at the hospitals, although prescriptions for the removal of the causes of disease are ordinarily given at the dentist's office, and of these a record must be kept. If classifying dentists and veterinarians with physicians is a fact to be considered in construing the act, it does not require a modification of the views above expressed, for the reason that personal examination into and personal supervision of each case is necessarily the rule, and prescribing for a patient in his absence is the exception.

If the above conclusions be correct, that the law contemplates prescribing or distributing of the drugs mentioned in the act only in case of the personal attendance of physicians on their patients, or of the personal visits of patients to their physicians, save in exceptional in-

stances, does a physician engage in "the legitimate practice of his profession," or prescribe the drug "in the course of his professional practice only," who does not see most of his patients, who bases most of his prescriptions on their written statements sent to him through the mails, and who prescribes the same remedy for all alike? Who determines what practices are legitimate and professional? The law does not in express language state; but does it do so by necessary implication? The deference to be paid to a departmental ruling and construction of the law is defined in Smythe v. Fiske, 23 Wall. 374, 382, 23 L. Ed. 47; U. S. v. Moore, 95 U. S. 760, 763, 24 L. Ed. 588; Nunn v. Wm. Gerst Brewing Co., 99 Fed. 939, 942 (C. C. A. 6) 40 C. C. A. 190; Swift & Co. v. U. S., 105 U. S. 691, 695, 26 L. Ed. 1108; Fairbank v. U. S., 181 U. S. 283, 310, 311, 21 Sup. Ct. 648, 45 L. Ed. 862; Merritt v. Cameron, 137 U. S. 542, 552, 11 Sup. Ct. 174, 34 L. Ed. 772; 26 Cyc. 1602 et seq.

The act of May 9, 1902 (32 Stat. 193, c. 784), providing inter alia for the inspection and regulation of the manufacture and sale of certain dairy products, and amending the act of August 2, 1886 (24 Stat. 209, c. 840), defining "butter" and imposing a tax upon and regulating the manufacture, sale and importation of oleomargarine, adopted section 20 of the Oleomargarine Act, which section provides that:

"The Commissioner of Internal Revenue with the approval of the Secretary of the Treasury may make all needful regulations for the carrying into effect of this act."

The only difference between the language of that section and that of the last paragraph of section 1 of the Harrison Narcotic Law is that the latter uses the word "shall" where the former uses the word "may." Section 4 of the act of 1902 defines adulterated butter to be:

"Any butter in the manufacture or manipulation of which any process or material is used with the intent or effect of causing the absorption of abnormal quantities of water, milk or cream."

The act does not define what quantity of water, milk, or cream is abnormal, but the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, promulgated a regulation that butter containing 16 per cent. or more of water, milk, or cream should be classified as adulterated butter under the act. The validity of that regulation was involved in Coopersville Co-operative Creamery Co. v. Lemon, 163 Fed. 145, 89 C. C. A. 595 (C. C. A. 6). Judge (later Mr. Justice) Lurton, speaking for the Circuit Court of Appeals, after alluding to the provisions of the act under consideration and to sections 161, 251, and 3447, R. S. U. S. (Comp. St. 1913, §§ 235, 870, 6349), said:

"Looking to the character of duties imposed upon the Commissioner of Internal Revenue, and the various provisions of law authorizing the promulgation of regulations in carrying out the plain purposes of the law, we entertain no serious doubt that this regulation was authorized."

The similarity of the instant case to that considered by the Circuit Court of Appeals is such as to make the Lemon Case controlling on this court. A statement of the reasons for holding the regulation

as to mail orders and professional practices now under consideration to be neither the delegation of legislative nor a grant of judicial power would be a reiteration of Judge Lurton's elaborate opinion. In Reetz v. Michigan, 188 U. S. 505, 507, 23 Sup. Ct. 390, 391 (47 L. Ed. 563), Mr. Justice Brewer quoted with approval from People v. Hasbrouck, 11 Utah, 291, 39 Pac. 918, as follows:

> "The objection that the statute attempts to confer judicial power on the board is not well founded. Many executive officers, even those who are spoken of as purely ministerial officers, act judicially in the determination of facts in the performance of their official duties; and in so doing they do not exercise 'judicial power,' as that phrase is commonly used, and as it is used in the Organic Act, in conferring judicial power upon specified courts. The powers conferred on the board of medical examiners are no wise different in character in this respect from those exercised by the examiners of candidates to teach in our public schools, or by tax assessors or boards of equalization in determining, for purposes of taxation, the value of property. The ascertainment * * * of qualifications to practice medicine by a board of competent experts, appointed for that purpose, is not the exercise of a power which appropriately belongs to the judicial department of the government."

See also Meffert v. State Board of Medical Registration, supra; France v. State, 57 Ohio St. 1, 47 N. E. 1041; Wharton & Stillé's Med. Jur. § 434.

That "unprofessional" has been held to be synonymous with "dishonorable" (State v. Med. Examining Board, 32 Minn. 324, 20 N. W. 238, 50 Am. Rep. 575), does not militate against the establishment of another standard by which to test professional conduct and the right to practice medicine. This precise point was ruled in Dent v. West Virginia, 129 U. S. 114, 9 Sup. Ct. 231, 32 L. Ed. 623. See also Hawker v. N. Y., 170 U. S. 189, 18 Sup. Ct. 573, 42 L. Ed. 1002. Session Laws of the various states and the reports of decided cases abound with illustrations of legislative enactments which impose new and added qualifications on those who engage in the practice of medicine. A summary of the laws touching that subject enacted in Ohio down to 1897 is found in 57 Ohio St. at pages 8, 9. For the purpose of increasing the national revenue, Congress declared that physicians who register and pay a designated tax may, on certain conditions, dispense or distribute certain drugs in the treatment of their patients, which, wrongfully used, are highly destructive of life and usefulness, and which, rightfully used, are often highly serviceable. It was willing to forego any advantages which might result to the government from the receipt of such tax rather than to permit the dispensing and distribution of such drugs by physicians who did not meet the prescribed conditions. That the exercise of the power to increase the revenues may operate to produce a result which the states may obtain by the exercise of the police power is immaterial. Congress established a board, as it were, with powers akin to those of a board of medical examiners, or a board of school examiners, or a board of equalization, to determine what applicants possess the requisite qualifications for registration and practice under the Narcotic Law. In unmistakable language it indicated that their practice must be legitimate and professional. It did not prescribe, as it might have done,

the standard of qualifications. It did, however, what under the authority of the Lemon Case it was altogether competent for it to do; it declared that the practice which should confer upon or deny the physician the right to register and dispense the specified drugs must be legitimate and professional. It was the design of Congress that standards of professional qualifications should be provided to render the law effective for accomplishing its purpose. The regulation fulfills the purpose of the law, and it cannot therefore be said to be an addition to it. U. S. v. Antikamnia Co., 231 U. S. 654, 667, 58 L. Ed. 419, Ann. Cas. 1915A, 49.

The fact is not overlooked that in U. S. v. 11,151 Pounds of Butter, 195 Fed. 657, 115 C. C. A. 463, the Eighth Circuit Court of Appeals had under consideration the same statute and regulation which was under review in the Lemon Case and reached an opposite conclusion; but that fact does not relieve this court from adherence to the law as announced by the appellate court of its own circuit, or from expressing its own view that the regulation of June 10, 1915, as to the point now under consideration, is valid. It follows from the foregoing that collectors of internal revenue should, in licensing physicians, enforce the departmental regulation against those doing a mail order business, as fully as any other valid regulation promulgated by constituted authority, and that physicians permitted to practice under the act who conduct their business in an illegitimate or unprofessional manner, subject themselves to the penalties of the law.

In the Lemon Case it was said that, if the regulation there under consideration had not the force of law as a conclusive determination of fact, it nevertheless furnished a working rule for the guidance of officers and the information of manufacturers, and, on the trial of a manufacturer of butter, from whom the tax was exacted on butter alleged to have more than 16 per cent. of water in it, a court will commit no error if it submits to a jury the question as to whether such a percentage of water is abnormal. It would not, therefore, be error for a trial judge, should he elect so to do, to determine, in a case triable to himself, or to submit to a jury, in a proper case, for its determination, the question of fact whether an accused party's methods of doing business debar him from practice under the law.

Reliance is had by plaintiffs on the averment that the greater part of the cocaine used in their preparation is in the form of the decomposition products of cocaine, and not as cocaine per se, and that the cocaine is denatured as to its habit-forming and habit-satisfying qualities. The statute, however, runs against the dispensing of the drug by a person not duly authorized to do so. There is no exemption on account of the form in which the drug exists or is prescribed.

If the right claimed by the government to seize and forfeit any of the enumerated drugs in the possession of violators exists, it is due to the extension (section 1, par. 4) to the special tax named in the act of some applicable statutory provision of some other law relating to special taxes. Such right is not conferred by the act itself, nor by sections 3163, 3164, 3224, or 3453, R. S. U. S. (Comp. St. 1913, §§ 5883, 5884, 5947, 6355)—the only statutory provisions to which atten-

tion has been directed—nor by any other statute that has come under my observation.

The plaintiffs are therefore entitled to a temporary injunction against the seizure and forfeiture of the cocaine in their possession, but in no other respect. Phila. Co. v. Stimson, 223 U. S. 605, 619, 620, 32 Sup. Ct. 340, 56 L. Ed. 570; School of Magnetic Healing v. McAnnulty, 187 U. S. 94, 108, 110, 23 Sup. Ct. 33, 47 L. Ed. 90; Magruder v. Belle Fourche Valley Water Users' Ass'n, 219 Fed. 72, 78, 79 (C. C. A. 8), 135 C. C. A. 524. The motion to dismiss is overruled. If the government elects to waive its claimed right to a seizure and forfeiture of the drug, the motion will be sustained, and the bill dismissed.

Following the announcement of the above opinion, the district attorney and the collector of internal revenue stated in open court that the latter had not been instructed to seize and forfeit the cocaine or preparation in the possession of the plaintiffs, and had at no time had, and does not now have, an intention to do so. For this reason, the motion to dismiss is sustained, and the bill is dismissed.